In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.

LTV STEEL COMPANY, INC., BCNR Mining Corporation, Nemacolin Mines Corporation, and Tuscaloosa Energy Corporation, Plaintiffs,

v.

Donna E. SHALALA, Secretary, Department of Health and Human Services; Joseph P. Connors, Sr., Marty D. Hudson, Thomas O.S. Rand, Elliott A. Segal, Carlton R. Sickles, Gail R. Wilensky, John Doe, Trustees of the United Mine Workers of America Combined Fund; and The United Mine Workers of America Combined Fund, Defendants.

Nos. 86 B 11270–11334, 86 B 11402 and 86 B 11464 (BRL). No. 93 Civ. 0554 (JSM).

United States District Court, S.D. New York.

May 7, 1993.

Karen Wagner, Davis Polk & Wardwell, New York City, for LTV Steel Co.

Donald Ayer, Jones, Day Reavis & Pogue, Washington, DC, for LTV.

Jami McKeon, Peter Buscemi, Morgan Lewis & Bockius, Washington, DC, Paul A. Green, John R. Moore, Beins, Axelrod, Osborne, Moody & Green, Washington, DC, for Combined Fund and Trustees.

Roger S. Hayes, U.S. Atty., S.D.N.Y., New York City, Edward A. Smith, Asst. U.S. Atty., for U.S.

David W. Allen, UMWA Health & Retirement Funds, Washington, DC.

John Kraljic, Stroock & Stroock & Lavan, New York City, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

This case centers around application of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. 102–486, Subtitle C, 106 Stat. 2776, 3036–56 (1992) (codified at 26 U.S.C. §§ 1, 9701 *et seq.*) (the "Coal Act"), recently enacted legislation which imposes costs on companies involved in the coal mining industry and their successors in or-

der to provide health and life insurance benefits to retired coal workers. Plaintiffs, all related companies in Chapter 11 reorganization proceedings, seek to determine the effect the Coal Act will have on their obligations.

*Background*

Plaintiff LTV Steel Company ("LTV Steel") is the parent of plaintiffs BCNR Mining Corporation, Nemacolin Mining Corporation, and Tuscaloosa Energy Corporation (collectively, the "Mining Subsidiaries"). LTV Steel and the Mining Subsidiaries, either in their corporate capacities or through former corporate parents, were signatories to numerous industry-wide contracts known as "National Bituminous Coal Wage Agreements" ("Wage Agreements"), which were the product of multi-employer bargaining by the Bituminous Coal Operators Association with the United Mine Workers of America. The 1950 Wage Agreement, the first such contract, established a trust entitled the "United Mine Workers of America Welfare and Retirement Fund of 1950" (the "1950 Retirement Fund") to provide pension, health and life insurance benefits and mandated contributions from employers based on the amount of coal tonnage mined, as did subsequent Wage Agreements until 1974. The 1974 Wage Agreement established a trust entitled the "United Mine Workers 1974 Benefit Plan and Trust" (the "1974 Benefit Trust") to provide health and life insurance benefits for workers retiring after its inception, and also bifurcated the 1950 Retirement Fund into two separate trusts pursuant to federal law, 29 U.S.C. §§ 1001 *et seq.*, one of which was entitled the "United Mine Workers of America 1950 Benefit Plan and Trust" (the "1950 Benefit Trust") and which mirrored the 1974 Benefit Trust. Each Wage Agreement provided that the employers were to be primarily responsible for health and life insurance benefits during the term of the agreement, while the various trusts were responsible for such benefits when workers were no longer covered by a Wage Agreement or their employer had ceased operations. The last rel-

evant Wage Agreement was negotiated in 1984 and expired on January 31, 1988.

Plaintiffs, along with LTV Steel's parent, The LTV Corporation, and over fifty other affiliates, filed for Chapter 11 bankruptcy protection on July 17, 1986. Subsequently, plaintiffs sought to terminate health benefits to retirees, including benefits required under the 1984 Wage Agreement. However, after introduction of Congressional legislation requiring plaintiffs to continue the benefits and a union strike, plaintiffs resumed provision of the benefits.

In late 1987, plaintiffs announced their intention to cease providing retiree benefits after January 31, 1988, the date of expiration of the 1984 Wage Agreement. When the 1974 Benefit Trust refused to assume responsibility for benefits for affected retirees, plaintiffs obtained a ruling in an adversary proceeding declaring that plaintiffs' obligations had terminated and those of the 1974 Benefit Trust had commenced at the end of the term of the 1984 Wage Agreement. *In re Chateaugay Corp.*, 945 F.2d 1205, 1208 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992).

So matters stood until late 1992 when Congress enacted the Coal Act. Stemming from a legislatively declared intention "to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees in the coal industry," Coal Act § 19142, the Coal Act combined the 1950 and 1974 Benefit Trusts into a trust entitled the "United Mine Workers of America Combined Benefit Fund" (the "Combined Fund"), and requires all signatories to any Wage Agreement (or their successors) to make contributions to the Combined Fund, which in turn is responsible for providing benefits to retirees. Each signatory's contribution, which is calculated annually and payable in monthly installments, is based on the number of retirees who worked for the signatory and the current cost of health care, with an additional contribution required for "orphan" benefi-

ciaries who are not allocated to a signatory or would be allocated to a signatory which has gone out of business.

Plaintiff LTV Steel and its affiliates are now preparing, after seven years, to emerge from Chapter 11 [1] and have scheduled a confirmation hearing on a plan that does not provide for payments under the Coal Act, which plaintiffs claim will be at least in excess of $12 million annually. Attempting to settle this issue before the confirmation hearing, plaintiffs have brought this action for a declaratory judgment, seeking to have the Coal Act declared unconstitutional and also seeking to determine its application to them. Only the latter issue is before this Court on plaintiff LTV Steel's motion for partial summary judgment. Defendants the trustees of the Combined Fund (the "Trustees") and the Combined Fund oppose the motion. There being no facts in dispute, this issue is appropriately decided by summary judgment.

*Discussion*

■ LTV Steel argues first that any claim the Combined Fund may have is a pre-petition claim and is thus barred because no timely proof of claim was filed. Under the Bankruptcy Code, a "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ..." 11 U.S.C. § 101(5)(A). Thus, the question is whether the Combined Fund had a "claim" before the petition was filed. *Cf.* 11 U.S.C. § 101(10) (defining "creditor" as an "entity that has a claim against the debtor that arose at the time of or before" the commencement of the bankruptcy case).

The statutory language defining a "claim" is drafted broadly, and has been so interpreted. *In re Robinson,* 776 F.2d 30, 34–36 (2d Cir.1985), *rev'd on other grounds,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *see* H.R.Rep. No. 595, 95th Cong.2d Sess. 309, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6266 ("claim" encompasses "all legal obligations of the

---

**1.** The Mining Subsidiaries apparently will not stay in business.

debtor, no matter how remote or contingent"). Tort claims have been found to have arisen pre-petition where all the "acts giving rise to the alleged liability are performed," even though the injury had not yet manifested. *In re Waterman S.S. Corp.*, 141 B.R. 552, 556 (Bankr.S.D.N.Y. 1992); *In re Johns–Manville Corp.*, 57 B.R. 680, 689 (Bankr.S.D.N.Y.1986). *But see In re Chateaugay*, 944 F.2d 997, 1003–04 (2d Cir.1991) (questioning rationale of basing "claim" only on pre-petition conduct). A claim for statutory liability for post-petition withdrawal from a contractually imposed obligation to pay into pension funds was likewise held to be pre-petition because it arose out of the pre-petition obligation. *Pension Ben. Guar. Corp. v. LTV Corp.*, 875 F.2d 1008, 1019 (2d Cir. 1989), *rev'd on other grounds*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); *Trustees of Amalgamated Ins. Fund. v. McFarlin's, Inc.*, 789 F.2d 98, 103–04 (2d Cir.1986).

However, where there is no legal relationship defined at the time of petition, it would be impossible to find even the remotest "right to payment." "The Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Chateaugay*, 944 F.2d at 1004 (quoting *In re All Media Properties, Inc*, 5 B.R. 126, 133 (Bankr. S.D.Tex.1980), *aff'd mem.*, 646 F.2d 193 (5th Cir.1981)); *see also In re Chateaugay*, 944 F.2d at 1005 (noting difficulty of applying contractual concepts of maturity and contingency to statutory claims). Claims under the Coal Act were not in any sense "contingent" or "unmatured" at the time of the petition; they simply did not exist.

There is no basis for terming these claims pre-petition.

The Third Circuit's decision in *In re Penn Cent. Transp. Co.*, 944 F.2d 164 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), addresses a closely analogous issue. There petitioners sought to assert CERCLA claims against the debtor, who defended on the ground that the claims were discharged because the acts giving rise to the claims took place pre-petition, even though CERCLA itself was not passed until after the bankruptcy discharge. The Court of Appeals held that the claims were not discharged because "at the time of the Consummation Order, there was no statutory basis for liability to be asserted against [the debtor] by the petitioners." *Id.* at 167; *see also United States v. Serafini*, 135 B.R. 219, 221 (M.D.Pa.1991) (confirmation "could not have possibly discharged the CERCLA liability because such liability did not exist at the time" of confirmation, thus "there was no debt or liability ... which could have been modified or altered by discharge") (citing *Penn Central*).

LTV Steel attempts to distinguish these cases on the basis that they were interpreting provisions of the Bankruptcy Act, which provided a narrower definition of "claim" than the superseding Bankruptcy Code which now governs. *See In re Robinson*, 776 F.2d at 34–45. The Code's broader definition of "claim" is not limitless, however: "Congress intended 'claim' to encompass any right held by any person or entity to enforce any money obligation of the debtor." *Id.* at 35. The logic of *Penn Central* and *Serafini* is thus equally applicable to the Code definition of a "claim", which still requires a legal "right" to be in existence at the time of filing.[2]

---

2. LTV Steel also contends that the authority of *Penn Central* is in question, inasmuch as it claimed as support *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), which in turn relied on *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). LTV Steel points to numerous cases in various circuits questioning the holding in *Frenville, see, e.g. In re Baldwin–United Corp. Litig.*, 765 F.2d 343, 348 n. 4 (2d Cir.1985), but we note that more recently the Second Circuit has cited *Schweitzer* with approval, if not adoption, *see In re Chateaugay*, 944 F.2d at 1003–04. In any case, the issue decided in *Frenville* does not relate to the holding of *Penn Central* cited herein.

*PBGC v. LTV Corp.* and *McFarlin's*, two cases on which LTV Steel relies heavily, are not to the contrary. In each case the Second Circuit found claims to relate to pre-petition debts where they were based on contractual obligations to pay into pension funds, grounding its conclusions in part on the fact that the pre-petition labor was the consideration giving rise to the claims asserted. *PBGC v. LTV Corp.*, 875 F.2d at 1019; *McFarlin's*, 789 F.2d at 103–04. LTV Steel argues that these cases compel the conclusion that any claim based on pre-petition labor is by definition a pre-petition claim. While this logic might hold for contractual claims, as were at issue in the two cases cited, it is inapplicable where the statute giving rise to the liability is not enacted until after the petition has been filed, for the reasons stated above. *See In re Chateaugay Corp.*, 112 B.R. 513, 520–21 (S.D.N.Y.1990), *aff'd*, 944 F.2d 997 (2d Cir. 1991) (distinguishing on this basis).

LTV Steel also asserts that no claim for liability under the Coal Act can lie against it because the applicable law is the law that existed at the time of filing. The cases cited by LTV Steel establish, at best, that the treatment and scope of a claim are frozen at the time of filing, and cannot be subsequently modified. None of the cases cited addresses the very different situation where a claim comes into being only after the petition has been filed as a result of legislation, and thus can in no sense be said to have arisen previously.

■ LTV Steel next argues that the Combined Fund's claim is one for "reimbursement or contribution" by a "co-debtor" and is thus disallowed under 11 U.S.C. § 502(e)(1). However, "co-debtor" status requires the *sharing* of a liability, *In re Baldwin–United Corp.*, 55 B.R. 885, 890 (Bankr.S.D.Ohio 1985); although the source of liability may differ, each debtor must be liable to the same party for essen-

tially the same claim, *In re White Motor Corp.*, 731 F.2d 372, 374 (6th Cir.1984). Here, LTV Steel is liable only to the Combined Fund, whereas the Combined Fund is liable only to individual retirees; under these circumstances, there is clearly no "sharing" of liability, and thus no co-debtor status on which to base disallowance.

■ Given that the claims at issue were not incurred pre-petition, the next question is whether they should be accorded any priority. Defendants argue that the contributions required by the Coal Act are a tax imposed by the federal government and incurred by the estate, and thus are administrative expenses entitled to first priority under 11 U.S.C. §§ 503 and 507.[3] LTV Steel denies that the contributions required should be classified as "taxes."[4]

"[U]nder § 503, two prerequisites will determine whether a tax claim will be granted a first priority: (1) the tax must not be specified in § 507(a)(7) ... of the Code and (2) the tax must be incurred by the estate." *In re O.P.M. Leasing Servs., Inc.*, 68 B.R. 979, 982 (Bankr.S.D.N.Y.1987); *see* n. 3, *supra*. Neither party claims that the payments at issue are taxes specified in § 507(a)(7); however, the more fundamental issue of whether these payments are a "tax" is hotly contested.

Whether these payments are to be considered taxes for bankruptcy purposes is a question of federal law. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941); *In re Pan Am. Paper Mills, Inc.*, 618 F.2d 159, 162 (1st Cir.1980); *In re Continental Minerals Corp.*, 132 B.R. 757, 758 (Bankr.D.Nev. 1991). The Supreme Court has said that tax priority "extends to those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Feiring*, 313 U.S. at 285, 61 S.Ct. at

---

**3.** 11 U.S.C. § 507(a)(1) provides that administrative expenses allowed under § 503(b) shall have first priority. 11 U.S.C. § 503(b)(1)(B) provides for allowance of "any tax ... incurred by the estate, except a tax of a kind specified in section 507(a)(7)," which section grants seventh priority to certain enumerated taxes.

**4.** LTV Steel's position is particularly curious in light of its complaint in this action which characterizes payments required by the Coal Act as "a tax." Complaint ¶ 33.

1029; *see New Jersey v. Anderson,* 203 U.S. 483, 492, 27 S.Ct. 137, 140, 51 L.Ed. 284 (1906). It expanded upon this definition in *National Cable Television Ass'n v. United States,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974), distinguishing a tax, which is imposed on the basis of the status of the payor, from a fee, which is a charge upon the payor for a benefit received; put another way, it classified taxes as obligations incurred involuntarily, and fees as obligations incurred voluntarily. *Id.; see United States v. River Coal Co.,* 748 F.2d 1103, 1106 (6th Cir. 1984).

In *In re Lorber Indus. of California, Inc.,* 675 F.2d 1062, 1066 (9th Cir. 1982), the Ninth Circuit, reasoning from the Supreme Court precedents, adopted the following four-part test to determine whether a charge was properly considered a tax: (1) If it imposes an involuntary pecuniary burden (2) imposed by the legislature (3) for public purposes (4) under the police or taxing powers of the government. Although the *Lorber* test as well as the precedents on which it was based interpreted provisions of the Bankruptcy Act, decisions based on the Bankruptcy Code have also embraced the test as a means of determining whether an obligation is a tax for bankruptcy purposes. *See, e.g. Continental Minerals,* 132 B.R. at 758; *In re O.P.M. Leasing Servs., Inc.,* 60 B.R. 679, 680 (Bankr.S.D.N.Y.1986).

The priority for administrative expenses given by § 507(a)(1) is to be narrowly construed so as not to undermine unduly the general policy of treating creditors equally, *McFarlin's,* 789 F.2d at 100–01; *In re Chateaugay Corp.,* 130 B.R. 690, 696 (S.D.N.Y.1991), and some courts have noticed a trend to "erode the preferred status of taxes," *see, e.g. Lorber,* 675 F.2d at 1067–68; *O.P.M. Leasing,* 68 B.R. at 985.

Obligations similar to those imposed on LTV Steel by the Coal Act have been found to be taxes for bankruptcy purposes. In *River Coal,* a federal statute required operators of coal mines to pay a charge per ton of coal mined to the Abandoned Mine Reclamation Fund, which was to be used to reclaim and restore land and water resources eroded by mining operations. 748 F.2d at 1104–06. Because the charges were "an involuntary exaction for a public purpose," they were considered a tax for bankruptcy purposes. *Id.* Similarly, mandatory contributions to a state insurance fund under a workman's compensation scheme were found to constitute taxes. *Pan American Paper Mills,* 618 F.2d at 161–62. More recently, and under the Bankruptcy Code rather than the Act, mandatory contributions to a state unemployment fund were held to be taxes for bankruptcy purposes. *Continental Minerals,* 132 B.R. at 758–59.

The contributions required under the Coal Act satisfy at least the first three of the four *Lorber* factors, and arguably satisfy the fourth. They are involuntary pecuniary burdens imposed by Congress for the stated public purpose of stabilizing the coal industry by "remedy[ing] problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees in the coal industry." Coal Act § 19142. They may well have a further public purpose in that they "provid[e] benefits to [retired] workers who might otherwise be forced onto public assistance programs." *Continental Minerals,* 132 B.R. at 759.

LTV Steel argues that Congress enacted the Coal Act under the interstate commerce clause, rather than under its police or taxing authority, and thus the obligations imposed are not taxes since the fourth prong of the *Lorber* test is not satisfied. While the *Lorber* test provides a helpful standard by which to determine whether an obligation is a tax, we do not take it to define absolutely such a determination. *See New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund,* 886 F.2d 714, 720 (4th Cir.1989) (legislative power invoked "not determinative"). Moreover, although Congress found that the stability of the coal industry affected interstate commerce, *see* Coal Act § 19142, it never explicitly invoked any legislative power. In fact, there is considerable reason to be-

lieve that Congress intended such obligations to be imposed under the taxing power, or at least to be exercises of both powers simultaneously. The statutory language was codified as Subtitle J of the Internal Revenue Code of 1986, a compilation of numerous previous exercises of the taxing power. Its administration, at least with regard to enforcement of penalty obligations, is under the supervision of the Secretary of Treasury, 26 U.S.C. § 9707, the official charged with enforcement of other taxing power legislation. While the labels and language contained in a statute do not dictate tax status, *see River Coal,* 748 F.2d at 1106, they can provide information as to the powers a legislature is seeking to act under. Given that this legislation could have been enacted pursuant to Congress' taxing power, that no such power was explicitly invoked does not affect whether obligations imposed are to be considered "taxes."

LTV Steel also contends that the Coal Act lacks one allegedly vital characteristic of a taxing statute: a provision for summary collection and enforcement by the government. But it cites no case in which a lack of such a provision was determinative of whether an obligation imposed was a tax.[5] Rather, as the Supreme Court has noted, "The form of the collection of taxes is left to the discretion of the taxing power; sometimes a lien is provided, sometimes a summary method of collection is awarded; in other cases, an action for debt is given ..." *Anderson,* 203 U.S. at 493, 27 S.Ct. at 141.

Admittedly, the vast majority of obligations found to be taxes for bankruptcy purposes have included some form of mech-anism for enforcement by the government. However, the Coal Act itself is not devoid of such provisions; under the Coal Act, the Secretary of Treasury is directed to assess a penalty of $100 per day per assigned eligible beneficiary if a signatory fails to make payment, 26 U.S.C. § 9707. Furthermore, the Secretary of Health and Human Services is charged with assigning eligible beneficiaries to signatories, assessing the annual payments, and generally administering the entire scheme. 26 U.S.C. §§ 9704, 9706. Thus, although non-existence of such mechanisms would not be dispositive, there are provisions for substantial government involvement. Overall, the Coal Act obligations are appropriately described as "taxes" due to their overwhelmingly involuntary nature, their explicitly stated public purpose, and their obvious potential to be imposed pursuant to the taxing power.

Such a result is consistent with the general aims of granting priority to administrative expenses. "Administrative expenses should include taxes which the trustee incurs in administering the debtor's estate ..." *O.P.M. Leasing,* 68 B.R. at 984. Although using this rationale to classify these obligations as "taxes" would be circular, there is no doubt that the charges incurred by LTV Steel not only are a result of its association with previous collective bargaining agreements, but also are a direct consequence of its continued corporate existence; the Coal Act only imposes obligations on signatories which are still "in business."[6] Thus, the charges stem directly from LTV Steel's continued operation in Chapter 11, and as such are costs of doing business best classified as "administrative expenses" within the Bankruptcy Code scheme.

5. Contrary to LTV Steel's assertions in its reply brief, *Feiring* did not characterize the government's ability to enforce statutory obligations as "key"; it merely noted that "the tax may be summarily collected by distraint of the property of either the seller or the buyer." 313 U.S. at 287, 61 S.Ct. at 1030. Moreover, the context for this statement was a discussion of whether a sales tax on sellers was "less a tax laid on the seller because [it] places a like burden in the alternative on the purchaser," *id.,* and so the reference to summary collection procedures was background only.

Nor does *In re Payne,* 27 B.R. 809 (Bankr.D.Kan. 1983), also cited by LTV Steel, hold government involvement dispositive of this issue. While the failure of a statute to provide for an automatic lien was considered a "non-tax characteristic" contributing to the court's determination that the obligation in question was not a tax, it was merely one factor in the totality of the decision. *Id.* at 817–19.

6. Accordingly, LTV Steel's continued assertions that these obligations are solely a result of pre-petition operations are inaccurate.

Other action by Congress provides at least collateral support for the conclusion that obligations imposed by the Coal Act should be given priority. On June 16, 1988, Congress passed the Retiree Benefits Bankruptcy Protection Act of 1988. Section 2 of that act amended the Bankruptcy Code to include a new § 1114, which provided for continued payment by debtors in Chapter 11 of, and allowed administrative expense status for, payments for retiree benefits. 11 U.S.C. § 1114(e). While Congress specifically exempted cases commenced prior to enactment from application of this section and it is thus is not operative in this case,[7] the amendment evidences a strong Congressional intent to accord priority to retiree benefit payments. An interpretation that the Coal Act payments are entitled to first priority is appropriate given this Congressional policy.

LTV Steel also argues that the obligations imposed by the Coal Act were not "incurred by the estate," and thus are not entitled to priority under § 503(b)(1)(B). This contention is merely a restatement of the above claim that the Coal Act obligations arose pre-petition, and is dispelled by the same reasoning. *See supra.*

Thus, the payments required under the Coal Act are properly classified as taxes under § 503(b)(1)(B) and any such obligations imposed before confirmation are entitled to first priority under § 507(a)(1).

Defendants, in a footnote in their answering brief, request partial summary judgment on the issue of the operation of the Coal Act. Such relief is inappropriate since, as defendants themselves admitted in their brief, they have submitted no formal motion demanding partial summary judgment; however, it is to be noted that the decision rendered today on undisputed facts binds the parties as the law of the case.

*Conclusion*

For the reasons stated above, LTV Steel's motion for partial summary judgment is DENIED. A status conference for this case is hereby set for June 10, 1993 at 9:30 a.m.

SO ORDERED.

---

7. Moreover, § 1114 has been specifically held not to require LTV Steel or the Mining Subsidiaries to continue making payments to the 1950 Benefit Trust or the 1974 Benefit Trust after the expiration of the 1984 Wage Agreement. *Chateaugay,* 945 F.2d at 1210.