**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 3 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

In re: CF&I FABRICATORS OF
UTAH, INC., et al.

    Reorganized Debtors.

_____

PENSION BENEFIT GUARANTY
CORPORATION,

    Appellant,

v.

CF&I FABRICATORS OF UTAH,
INC.; COLORADO & UTAH LAND
COMPANY; KANSAS METALS
COMPANY; ALBUQUERQUE
METALS COMPANY; PUEBLO
METALS COMPANY; DENVER
METALS COMPANY; PUEBLO
RAILROAD SERVICE COMPANY;
CF&I FABRICATORS OF
COLORADO, INC.; CF&I STEEL
CORPORATION; COLORADO &
WYOMING RAILWAY COMPANY;
UNSECURED CREDITORS
COMMITTEE; UNITED
STEELWORKERS OF AMERICA
AFL-CIO-CLC; WILLIAM J.
WESTMARK, Trustee of the Colorado
& Wyoming Railway Company,

    Appellees.

No. 97-4121

In re: CF&I FABRICATORS OF
UTAH, INC., et al.

    Reorganized Debtors.

_____

PENSION BENEFIT GUARANTY
CORPORATION,

    Appellant,

v.

CF&I FABRICATORS OF UTAH,
INC.; COLORADO & UTAH LAND
COMPANY; KANSAS METALS
COMPANY; ALBUQUERQUE
METALS COMPANY; PUEBLO
METALS COMPANY; DENVER
METALS COMPANY; PUEBLO
RAILROAD SERVICE COMPANY;
CF&I FABRICATORS OF
COLORADO, INC.;  COLORADO &
WYOMING RAILWAY COMPANY,

    Appellees.

No. 97-4122

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. Nos.  93-CV-744-B and 96-CV-202-B)**

_____

Susan E. Birenbaum (James J. Keightley, General Counsel; William G. Beyer,
Deputy General Counsel; Israel Goldowitz, Assistant General Counsel; Garth D.
Wilson, Attorney; Nathaniel Rayle, Attorney; and Kenneth J. Cooper, Attorney,
Pension Benefit Guaranty Corporation, Office of the General Counsel,
Washington, D.C.; and Charles G. Cole, Steptoe & Johnson, L.L.P., Washington,
D.C., with her on the briefs), Assistant General Counsel, Pension Benefit
Guaranty Corporation, Washington, D.C., for Appellant.

Frank Cummings (Steven J. McCardell, LeBoeuf, Lamb, Greene & MacRae,
L.L.P., Salt Lake City, Utah; Weston L. Harris and Steven T. Waterman, Ray,
Quinney & Nebeker, Salt Lake City, Utah; Joseph E. O'Leary and Scott A. Faust,
Choate, Hall & Stewart, Boston, Massachusetts, with him on the briefs), LeBoeuf,
Lamb, Greene & MacRae, L.L.P., Washington, D.C., for Appellees Reorganized
CF&I Fabricators of Utah, Inc., et al.

Richard M. Seltzer (Ann E. O'Shea, Richard A. Brook, and Mimi Hart, Cohen,
Weiss and Simon, New York, New York; Carl B. Frankel and Paul Whitehead,
United Steelworkers of America AFL-CIO-CLC, Pittsburgh, Pennsylvania, with
him on the briefs), Cohen, Weiss and Simon, New York, New York, for Appellee
United Steelworkers of America AFL-CIO-CLC.

---

Before **PORFILIO**, **MCKAY,** and **TACHA**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

In this appeal we are asked to determine whether claims for a Chapter 11 debtor's minimum contributions to an employee pension plan are entitled to tax or administrative priority in bankruptcy. In addition, we must determine which valuation method should be used to calculate the present value of unfunded benefit liabilities owed by CF&I Steel Corporation and its subsidiaries (CF&I), Appellees-Debtors in this case.

-3-

This inquiry comes to us because of a conflict between provisions of the Employee Retirement Income Security Act (ERISA) and the Bankruptcy Code. Appellant Pension Benefit Guarantee Corporation (PBGC), a private governmental corporation modeled after the Federal Deposit Insurance Corporation and charged statutorily with protecting and preserving private pension plans, seeks to recover sums by way of priority claims from CF&I's Chapter 11 bankruptcy estate. PBGC bases its rights to bankruptcy priority chiefly upon powers and rights vested in it by ERISA, but not the Bankruptcy Code. The major controversy between the parties is whether the ERISA provisions carry over into bankruptcy or whether PBGC comes to Chapter 11 like any other unsecured creditor. After consideration of all the arguments, we conclude PBGC is not entitled to special rights in bankruptcy and its ERISA powers and rights do not give it priority over the other unsecured creditors of CF&I's estate.

## A. Background

Prior to the economic events which eventually led CF&I into Chapter 11, it sponsored a defined benefit pension plan subject to the termination provisions of Title IV of ERISA. An employer's choice to initiate such a pension plan is totally voluntary; however, once that plan is established, the employer must meet the

minimum funding standards prescribed in the Internal Revenue Code (IRC) and ERISA. Moreover, the employer must meet these standards until its plan is terminated either voluntarily by the employer or involuntarily by PBGC.

CF&I met its funding obligations until a decline in economic conditions of the American steel industry left it unable to make minimum funding contributions of approximately $14 million. This state of affairs led CF&I into filing a Petition for Relief under Chapter 11 of the Bankruptcy Code.

CF&I continued to operate its businesses as debtor-in-possession and made substantial contributions to non-PBGC insured employee benefit plans providing health and life insurance. Although CF&I made no contributions to its pension plan, it did not seek voluntary termination. Finally, when the assets of the estate dwindled, PBGC terminated the plan and became its statutory trustee. *See* 29 U.S.C. § 1342 ("The [PBGC] may institute proceedings under this section to terminate a plan whenever it determines that ... the plan has not met the minimum funding standard required under section 412 of Title 26 ....").

Subsequently, CF&I achieved confirmation of a negotiated plan of reorganization which, among other provisions, set aside a sum of money as an "Appeal Fund" preserving PBGC's right to pursue its claims against that fund. PBGC has agreed to limit its recovery, if any, to the amount set aside.

PBGC filed two claims against the estate. The first was in the amount of $64,874,511 for CF&I's unpaid contributions to the benefit plan. The second was in the amount of $263,200,000 for unfunded benefit liabilities accruing because of the lack of assets in the benefit plan. For reasons we shall discuss later, PBGC asserted its claims were entitled to priority payment as a tax claim and were a cost of the estate entitled to priority as an administrative claim.

The bankruptcy court held PBGC was entitled to an administrative priority claim for the post-petition component of its unpaid contributions claim attributable to post-petition services of employees. However, the court denied tax priority or administrative priority for amounts other than these post-petition costs. The district court affirmed these decisions.

However, the district court reversed the bankruptcy court's holding that PBGC's unfunded benefits claim, which must be reduced to present value to be allowed, should be valued in accordance with PBGC's regulatory system and not by Bankruptcy Code standards. Finding an inexorable conflict between ERISA and the Bankruptcy Code, the court held the Bankruptcy Code must dominate. Hence, it concluded, "the actuarial present value of guaranteed benefits in a reorganization context [must be] determined according to bankruptcy law." On remand, the bankruptcy court applied the "prudent-investor" valuation method and

allowed PBGC a general unsecured claim in the amount of $124,441,000 as the present value of CF&I's unfunded benefit plan future liabilities.

On appeal to this court, PBGC contends the district court erred by denying tax priority to its first claim based on unpaid past plan contributions in excess of $1 million and administrative priority to its entire claim for unpaid plan contributions. It also contends the court erred by refusing to use PBGC's regulatory methodology to determine the present value of the unfunded benefits claim.

## B. Tax Priority

PBGC argues because of specific provisions in ERISA, we should conclude Congress expressly directed that CF&I's unpaid minimum funding contributions in excess of $1 million must be treated as taxes and accorded tax priority under the Bankruptcy Code. The district court's denial of tax priority is a conclusion of law which we review de novo. *Broitman v. Kirkland (In re Kirkland)*, 86 F.3d 172, 174 (10th Cir. 1996).

PBGC's argument is grounded upon 26 U.S.C. § 412(n)(1)(B) which provides, when unpaid minimum funding contributions exceed $1 million, "then there shall be a lien in favor of the plan ... upon all property, whether real or

personal, belonging to such person ...." Moreover, 26 U.S.C. § 412(n)(4) (1990) adds:

> (B) Period of lien. -- The lien imposed by paragraph (1) shall arise on the 60th day following the due date for the required installment ....

> (C) Certain rules to apply -- Any amount with respect to which a lien is imposed under paragraph (1) shall be treated as taxes due and owing the United States and rules similar to the rules of subsections (c), (d), and (e) of section 4068 of the Employee Retirement Income Security Act of 1974 shall apply with respect to a lien imposed by subsection (a) and the amount with respect to such lien.

The first question we must resolve, however, is to what extent these ERISA provisions are applicable in bankruptcy. To resolve the question, both parties point to ***United States v. Reorganized CF&I Fabricators, Inc. (In re CF&I Fabricators (I))***, 518 U.S. 213 (1996), where the Court examined whether an "exaction ought to be treated as a tax [in bankruptcy] ... without some ... dispositive direction [from Congress]." ***Id.*** at 219. At issue was an exaction under the IRC of 10% on the amount of the accumulated funding deficiency of CF&I's Plan for which the IRS asserted a tax priority claim.[1] Although the IRC

---

[1]*See* 26 U.S.C. § 4971(a), which states:

> **Initial tax.**–For each taxable year of an employer who maintains a plan to which section 412 applies, there is hereby imposed a tax of 10 percent (5 percent in the case of a multiemployer plan) on the amount of the accumulated funding deficiency under the plan, determined as of the end of the plan year ending with or within such taxable year.

defines the exaction as a "tax," the Court stated, "characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context ...." *Id.* at 224.

To determine whether Congress intended the exactions be given tax treatment in the bankruptcy context, the Court first looked for some "explicit connector between" the IRC provision and the Bankruptcy Code. Finding no link, the Court "looked behind the label placed on the exaction" and conducted a "functional examination" of the provision in question to determine whether it was "'a pecuniary burden laid upon individuals or property for the purpose of supporting the Government.'" *Id.* (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906)).

CF&I argues there is no "explicit connector" between § 412(n) and the Bankruptcy Code; therefore, we must apply the "functional examination" to determine if the exaction in this case qualifies as a tax. In pursuit of that examination, it reasons because PBGC is a privately funded entity, the payment of the minimum benefits contribution cannot possibly be "for the purpose of supporting the Government." Thus, CF&I concludes, those required payments do not meet the definition of a tax.

In response, the PBGC insists there is a connection between § 412(n) and the Bankruptcy Code in this case because, unlike *In re CF&I Fabricators (I)*, the ERISA provision specifically "connects" to the Bankruptcy Code. PBGC points

to that portion of § 412(n)(4)(C) which states, "[a]ny amount with respect to which a lien is imposed ... shall be treated as taxes ... and rules similar to the rules of subsections (c), (d), and (e) of section 4068 of [ERISA] shall apply ...." Moreover, § 4068(c) adds, "[i]n a case under Title 11 or in insolvency proceedings, the lien imposed under subsection (a) of this section shall be treated in the same manner as a tax due and owing to the United States for purposes of Title 11 ...." 29 U.S.C. § 1368(c).

Reading these provisions together, we can see at least a tangential connection between § 412(n) and the Bankruptcy Code. The deciding question, however, is whether they constitute an "explicit connection" withing the meaning of *In re CF&I Fabricators (I)*. We do not believe they do.

As we read the Court's analysis, the key to whether a statutory provision is "explicit" in this context is whether the *Bankruptcy Code* adopts and makes specific reference to the provisions of the other law. *In re CF&I Fabricators (I)*, 518 U.S. at 220. In this case, even though ERISA tangentially refers to "a case under Title 11 or in insolvency proceedings," the defect in the statutory construct found in *In re CF&I Fabricators (I)* is still present. That is, Congress made no specific reference in 11 U.S.C. § 507(7) to 29 U.S.C. § 412(n)(4). As a consequence, the relationship established between ERISA and the Bankruptcy Code is not explicit by definition. Thus, we conclude there is no *expressed*

congressional intent that the "tax treatment" described in § 412 was meant to apply in the bankruptcy context.

This conclusion takes us into the functional analysis initiated in *In re CF&I Fabricators (I)*. The quest begins with *City of New York v. Feiring*, 313 U.S. 283 (1941), in which the Court instructed tax priority in bankruptcy "extends to those pecuniary burdens laid upon individuals or their property, regardless of their consent, **for the purpose of defraying the expenses of government** or of undertakings authorized by it." *Id.* at 285 (emphasis added). As we have noted recently in *United Mine Workers 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.)*, No. 97-1276, 1998 WL 380966 (10th Cir. Colo. July 9, 1998), ___ F.3d ___ (10th Cir. 1998), this analysis was sharpened in *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478 (2d Cir. 1995), which followed the lead of the Ninth Circuit[2] in setting forth four factors for determining whether contributions required of a debtor are entitled to tax priority in bankruptcy.[3] If the contributions are:

1.     An involuntary pecuniary burden, regardless of name, laid upon the individuals or property;

2.     Imposed by, or under authority of the legislature;

---

[2]*See County Sanitation Dist. No. 2 v. Lorber Indus., Inc. (In re Lorber Indus., Inc.),* 675 F.2d 1062, 1066 (9th Cir. 1982).

[3]Although the cases do not involve ERISA contributions, we choose to follow the paradigm because of its rationality.

3.     For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

4.     Under the police or taxing power of the state;

the contributions have the functionality of a tax and claims for those contributions are entitled to tax priority. This analysis disposes quickly of PBGC's basic contention.

We believe the ERISA contribution fails the third element of the ***Chateaugay*** test. PBGC admits the contributions are directed to and for the protection of individual benefit plans. Thus, the object of the contributions is not to defray the expenses of the government or any governmental undertaking, but rather, is to finance a private obligation. Although mandated by statute, there is simply no credible argument that the required payments fund either a function of the United States or any of its undertakings. It thus follows PBGC's claim for unpaid minimum contributions is not to be accorded tax priority.[4]

---

[4]The bankruptcy court and district court both determined PBGC's minimum contributions claim was not entitled to this tax priority because the lien of § 412(n) did not arise prior to CF&I's bankruptcy petition. Section 412(n)(4)(B) states the lien imposed "shall arise on the 60th day following the due date ...." Here, the due date for CF&I's minimum contribution was less than 60 days before the Debtors filed bankruptcy; hence, the automatic stay of bankruptcy would have prevented the lien from arising. As Debtors insist, "the automatic stay prevented any liens from affixing, being created, perfected, or enforced." Our holding here makes consideration of this point moot.

## C. Administrative Priority

PBGC next argues if its minimum contributions claim does not qualify as a priority tax claim, it is still entitled to a priority administrative claim because the contributions were "actual, necessary costs and expenses of preserving the estate ... for services rendered after the commencement of the case."  11 U.S.C. § 503(b)(1)(A).  PBGC argues we should be governed by the reasoning of *Reading Co. v. Brown*, 391 U.S. 471 (1968).

In *Reading*, a case under the former Bankruptcy Act, the Court granted administrative priority to a claim for post-petition "damages resulting from the negligence of the receiver."  Later cases have expanded this analysis.  *See, e.g., Cumberland Farms, Inc. v. Florida Dep't of Envtl. Protection*, 116 F.3d 16 (1st Cir. 1997) (fine for violation of financial responsibility provision of environmental laws); *Alabama Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449 (11th Cir. 1992) (civil penalties for violations of the Alabama Surface Mining Act).  At a minimum, these cases demonstrate a judicial willingness to extend administrative claim status to tortious damages incurred post-petition and statutory penalties in the environmental law arena incurred post-petition.  For PBGC's argument to succeed, therefore, the minimum contributions would have to be statutory and post-petition.

In support of its position that the minimum contributions are a statutory requirement, PBGC cites the provision requiring satisfaction of the minimum funding standard. 29 U.S.C. § 1082(a)(1). PBGC then notes CF&I was obliged to meet these statutory obligations until the Plan was terminated and maintains that obligation continued even during bankruptcy, relying upon *In re New Center Hosp.*, 200 B.R. 592, 593 (E.D. Mich. 1996) ("Courts have held that statutory obligations that bind the debtor will subsequently bind the bankruptcy trustee."). PBGC argues this provision makes clear the minimum contributions claim in this case arises out of a statutorily required post-petition obligation that could not be abandoned.

CF&I responds this contention overlooks the fact the CF&I pension plan was written, collectively bargained, relied upon, and was part of the consideration for the work performed by its beneficiaries in the decades before its bankruptcy. Moreover, CF&I reminds, the Bankruptcy Code itself recognizes contributions to pension plans are compensation for services and, thus, by definition are contractual in nature. *See, e.g.*, 11 U.S.C. § 507(a)(4) (granting a fourth priority to "allowed unsecured claims for **contributions** to an employee benefit plan ... (a) arising from **services rendered** within 180 days before the date of the filing of the petition ...." (emphasis added)).

Curiously, PBGC's own Reply Brief boosts CF&I's argument in stating:

In this case CF&I and the USWA bargained for pension benefits that the company later found it could not afford. These parties together could have agreed, either before or after bankruptcy, to terminate the Pension Plan ("Plan") voluntarily before contributions went unpaid and the funding gap widened.

It is evident the plan and the obligations arising from it were a matter of contractual bargaining and agreement between an employer and its employees. The fact a statute provides the means by which they may terminate their agreement does not trump the contractual nature of the benefits plan.

Even if we were to assume the contributions were statutory in nature, the *Reading* line of cases only allows administrative priority for post-petition expenses. *See In re Sunarhauserman, Inc.*, 126 F.3d 811, 817 (6th Cir. 1997) ("To be sure, the *Reading* rationale allows administrative expense priority in the absence of a post-petition benefit to the estate. However, even in *Reading* and cases following it, the debt at issue arose post-petition."). Hence, the issue devolves to whether the minimum contributions are pre- or post-petition debts.

CF&I argues the claims are "derived from pension credits under a pension plan, all of which were earned by pre-petition consideration consisting of the labor of the pension plan's participants who did the work that earned these pensions." This position rests on the principle that liabilities are not incurred post-petition simply because they become due post-petition. *See, e.g., Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986);

-15-

***LTV Corp. v. PBGC (In re Chateaugay Corp.)***, 115 B.R. 760, 775 (Bankr.

S.D.N.Y. 1990) (vacated) ("The PBGC's right to payment upon termination was, on

the petition date, a classic pre-petition contingent claim.  The post-petition

termination of the pension plans did not transform the PBGC's contingent pre-

petition claims into post-petition claims."); ***LTV Corp. v. PBGC (In re***

***Chateaugay Corp.)***, 130 B.R. 690, 697 (S.D.N.Y. 1991) ("PBGC's claims are pre-

petition contingent claims because labor giving rise to the pension obligations was

performed pre-petition."); ***In re Sunarhauserman, Inc.***, 126 F.3d at 819.

In contrast, PBGC points to the Coal Industry Retiree Health Benefit Act of

1992, 22 U.S.C. §§ 9701-9722, (Coal Act), and cases in which courts under its

provisions wrestled with bankruptcy priorities, most notable of which is ***LTV Co. v.***

***Shalala (In re Chateaugay Corp.)***, 154 B.R. 416 (S.D.N.Y. 1993), *aff'd*, 53 F.3d

478 (2d Cir. 1995).

> [T]here is no doubt that the charges incurred by LTV Steel not only are
> a result of its association with previous collective bargaining
> agreements, but also are a direct consequence of its continued
> corporate existence; the Coal Act only imposes obligations on
> signatories which are still "in business."  Thus, the charges stem from
> LTV Steel's continued operation in Chapter 11, and as such are costs
> of doing business best classified as "administrative expenses" within
> the Bankruptcy Code scheme.

*Id.* at 422 (footnote omitted).

We do not find the Coal Act cases helpful here.  The nature of the Coal Act

claims was fundamentally different from the claim presented in this case because

-16-

the Coal Act claims are entitled to priority as a tax. ***In re Sunnyside Coal Co.***, No. 97-1276, 1998 WL 380966, at *4. Inasmuch as the contributions in this case are not taxes, we can draw no parallels from the Coal Act cases that would apply here.[5]

Pointedly, asserting a separate interest from that of the Debtors, Appellee United Steel Workers of America (USWA)[6] suggests when Congress wanted to give administrative priority to claims, it did so by amending the Bankruptcy Code. In particular, USWA cites 11 U.S.C. § 1114, in which Congress provided that payment of retiree medical benefits due during bankruptcy "has the status of an allowed administrative expense." In contrast, Congress has not amended the Bankruptcy Code to provide administrative status for the PBGC's minimum funding contribution claim. We hold that claim is not entitled to administrative priority in this case.

### D. Valuation of the Unfunded Benefits Claim

We turn now to the problem of valuing the claim for liabilities that accrued for plan benefits when PBGC terminated the plan. Inasmuch as those liabilities are

---

[5]However, to the extent PBGC's claims are based on the labor of the workers during the post-petition period until termination, they have a post-petition administrative claim. In fact, the bankruptcy court has already allowed that claim.

[6]A major portion of the Appeals Fund will accrue to interests represented by USWA if the judgment of the district court is affirmed.

for beneficiaries' payments that extend into the future, the amount of the liability must be reduced to present value so the debt can be dealt with under the reorganization plan. While the parties agree to the necessity for such a valuation, they disagree over the methodology to be employed. The dispute is significant because the proffered methods produce marked differences of $222,866,000 if PBGC's approach is utilized or $124,441,000 if CF&I prevails. The district court chose the latter, and PBGC claims the choice was erroneous.

To insure the relative equality of payment between claims that mature in the future and claims that can be paid on the date of bankruptcy, the Bankruptcy Code mandates that all claims for future payment must be reduced to present value. 11 U.S.C. § 502(b) ("[T]he court ... shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition ...."). Accepting the need to discount the amount of the claim, the parties disagree only over the approach to valuation because of two ERISA provisions.

The first, 29 U.S.C. § 1362(b)(1)(A), provides:

[L]iability to [PBGC] shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan ....

The second, 29 U.S.C. § 1301(a)(18), defines the "amount of unfunded benefit liabilities" as:

the excess (if any) of --

-18-

(A)    the value of the benefit liabilities under the plan (determined as of such date on the basis of assumptions prescribed by [PBGC] for purposes of section 1344 of this title), over

(B)    the current value (as of such date) of the assets of the plan.

PBGC maintains this combination of statutes represents an express delegation of rule-making power to PBGC to determine the present value of its claims for terminated plans.  PBGC argues, "Congress mandated that the assumptions used to determine the present value of benefit liabilities under terminated pension plans be the same assumptions used for purposes of valuing a plan's benefits under 29 U.S.C. § 1344."[7]

PBGC relies upon *Batterton v. Francis*, 432 U.S. 416 (1977), and *Chevron v. NRDC*, 467 U.S. 837 (1984), to remind us when Congress delegates rule-making power, the rule enacted has the force of law.  In addition, it  maintains the district court should have applied ERISA as an "external law" to determine the validity and amount of the claim in bankruptcy.  *See Landsing Diversified Properties -- II v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 595-97 (10th Cir. 1990).

_____

[7]Because the liabilities of a terminating benefit plan are usually satisfied by the plan's purchase of annuities from private insurance companies, PBGC's methodology "produces a value of benefit liabilities in line with prices of insurance company annuity contracts issued to cover such benefits."  The PBGC adjusts the rates quarterly using data from insurance company annuity price quotes.

Although valid in other contexts, we do not believe these principles are applicable here. First, as noted by CF&I, 29 U.S.C. § 1301(a)(18) defines the amount of unfunded benefit liabilities "for purposes of this title [ERISA]" only. Therefore, its terms cannot extend to bankruptcy.

Second, 29 U.S.C. § 1301(a)(18) conflicts with provisions of the Bankruptcy Code, and, as the district court held, this conflict must be controlled by the Bankruptcy Code. Indeed, the very action in which the claim arises is, after all, bankruptcy. Congress has provided very precise contours of how claims that are administered in Chapter 11 are to be decided, and has pronounced as a cardinal rule that all claims within the same class must be treated alike. 11 U.S.C. § 1123 (a)(4). That principle would be violated here if PBGC's interpretation of § 1301(a)(18) were adopted because PBGC's discount rate would apply only to it and not any other general unsecured creditor. Congress has made clear when ERISA conflicts with another provision of federal law, ERISA must be subordinated. 29 U.S.C. § 1144(d).

Nothing in the ERISA sections relied upon by PBGC implies a carry-over into the realm of bankruptcy to allow PBGC to set its own valuation methodology. Even though that methodology was adopted in the exercise of PBGC's administrative authority, we have no doubt of its inapplicability in the world of bankruptcy. The district court did not err in requiring the bankruptcy court to

employ the prudent-investor discount to reach the present value of PBGC's unfunded benefits liability claim.

The judgment of the district court is **AFFIRMED**.