**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 9 1998**

**PATRICK FISHER**
**Clerk**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: SUNNYSIDE COAL COMPANY,

    Debtor,

--------------------------------------------------

UNITED MINE WORKERS OF
AMERICA 1992 BENEFIT PLAN,
through its trustees, MICHAEL M.
HOLLAND, MARTY D. HUDSON,
THOMAS F. CONNORS and ROBERT
T. WALLACE,

    Appellees,

v.

KENNETH A. RUSHTON, Trustee of
the Estate of Sunnyside Coal Company,

    Appellant,

--------------------------------------------------

WESTMORELAND COAL COMPANY,
UNITED MINE WORKERS OF
AMERICA COMBINED BENEFIT
FUND,

    Amici Curiae.

No. 97-1276

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 96-M-2471)**

_____

Kenneth L. Cannon II (Steven J. McCardell and Penrod W. Keith with him on the briefs), LeBoeuf, Lamb, Greene & MacRae, L.L.P., Salt Lake City, Utah, for Appellant.

Jami Wintz McKeon (David W. Allen, Office of the General Counsel, UMWA Health & Retirement Funds, Washington, DC; Paul Green, Mooney, Green, Baker, Gibson & Saindon, P.C., Washington, DC; and Paul D. Rubner, Rubner & Kutner, P.C., Denver, CO, with her on the brief), Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Appellees.

Robert A. Greenfield, Lee R. Bogdanoff and Martin R. Barash, Stutman, Treister & Glatt Professional Corporation, Los Angeles, California, on the brief for Amicus Curiae Westmoreland Coal Company.

Gary M. Ford and Lincoln Weed, Groom and Nordberg, Chartered, Washington, D.C.; Paul D. Rubner, Rubner & Kutner, P.C., Denver, Colorado; and David W. Allen and Brian H. Benjet, Office of the General Counsel, UMWA Health & Retirement Funds, Washington, D.C., on the brief for Amicus Curiae United Mine Workers of America Combined Benefit Fund.

_____

Before **PORFILIO, MCKAY**, and **BRORBY**, Circuit Judges.

_____

**PORFILIO**, Circuit Judge.

_____

This appeal presents the question whether premiums assessed against a bankruptcy estate under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722, are "tax[es] ... incurred by the estate," 11 U.S.C. § 503(b)(1)(B), entitled to

administrative priority.  We join the Second and Fourth Circuits in holding they are and affirm.[1]

## I.

The factual background of this case resonates with those addressed in *Adventure Resources, Inc. v. Holland,* 137 F.3d 786, 793 (4th Cir. 1998), and *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 498 (2d Cir.), *cert. denied*, 516 U.S. 913 (1995), and hearkens the history of the enactment of the Coal Act.  That history, as more comprehensively set forth in *Chateaugay,* was aptly summarized in a November 1990 report issued by the Advisory Commission on United Mine Workers of America Retiree Health Benefits (the Coal Commission).  Key to the Coal Commission's findings was "[r]etired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years.  That commitment should be honored.  But today those expectations and commitments are in jeopardy." *Coal Commission Report: A Report to the Secretary of*

---

[1]Although the United Mine Workers of America moved to dismiss this appeal on the ground the district court order is not final because its remand to the bankruptcy court anticipates significant further proceedings, we disagree and exercise jurisdiction.  The district court's order asks the bankruptcy court to perform a ministerial task involving "no exercise of considerable judicial discretion," and no significant further proceedings. *See State Bank of Spring Hill v. Anderson (In re Bucyrus Grain Co.)*, 905 F.2d 1362, 1366 (10th Cir. 1990) (citation omitted) (internal quotations omitted).  We therefore **DENY** the UMWA's motion.

*Labor and the American People (*Nov. 1990), at 1, JA 393, 4905 [hereinafter, *Report*], quoted in ***Chateaugay***, 53 F.3d at 485.

This finding echoed five decades of labor unrest and economic turmoil in the coal industry beginning in 1946 when President Truman ordered the Secretary of the Interior to take over the nation's mines.  Emerging from that crisis was "an unprecedented system for providing health and pension benefits to workers at the center of which stood two separate, industry-wide benefit funds," one, a retirement pension plan, and the other, a health benefits fund.  53 F.3d at 481.  Successor wage agreements in 1950, 1971, 1974, and 1978 negotiated between the United Mine Workers of America (UMWA) and coal operator groups like the Bituminous Coal Operators Association (BCOA) delinked pension benefits from nonpension benefits like health care, and continued to embody in explicit language the promise that miners with a certain number of years of service were "entitled to receive health benefits until death," and would be fully guaranteed the pension and health benefits of prior agreements.  *Id.* at 482-83.

Despite these agreements, the 1980's ravaged retired miners' benefit plans as contributing mining companies either went out of business, "orphaning" their former employees, or were relieved of their responsibilities to contribute to prior benefit trusts. The depletion of funds resonated in the vacuum created by soaring health care costs. Documenting these deficits, the 1990 Coal Commission reported to Congress any new scheme to finance health care for retired miners must include: "[T]he imposition of a

statutory obligation to contribute on current and past signatories, mechanisms to prevent future dumping of retiree health care obligations, authority to utilize excess pension assets and the implementation of state-of-the-art managed care and cost containment techniques." *Report* at 60, JA 464, quoted in **Chateaugay**, 53 F.3d at 485.

The resulting 1992 Coal Act, Pub. L. No. 102-486, 106 Stat. 2776, 3036-56 (codified at 26 U.S.C. §§ 9701-9722), targeted current and former signatory operators, defined as "a person which is or was a signatory to a coal wage agreement," § 9701(c)(1), and required them to pay benefits for their own retirees and to share in the cost of benefits to orphaned retirees.[2] To that end, Congress established two new funds, the UMWA Combined Benefit Fund (the Combined Fund), which merged the 1950 and 1974 Benefit Plans, 26 U.S.C. § 9702(a), and the 1992 UMWA Benefit Plan (the 1992 Plan). To be eligible to receive health and death benefits from the Combined Fund, coal industry retirees actually had to be receiving benefits from the 1950 and 1974 Benefit Trusts as of July 20, 1992. 26 U.S.C. § 9703(f). The 1992 Plan covers employees who retired before September 30, 1994, and are not eligible for the Combined Fund. 26 U.S.C. § 9712(b)(1). Like the Combined Fund, the 1992 Fund is financed by a prefunding premium, an annual payment based on the estimated costs of future benefits to orphaned retirees, and a per beneficiary premium, monthly assessments to reimburse the UMWA for monthly

---

[2]"Orphaned" miners are those "whose employers have abandoned either the coal industry or the UMW." **Eastern Enterprises v. Chater**, 110 F.3d 150, 153 (1st Cir. 1997).

payments made to coal industry retirees.  While the obligation to pay premiums to the

Combined Fund is limited to entities that are "in business," 26 U.S.C. § 9711(a), the 1992

Plan eliminated the phrase "in business" from the signatory's obligation under 26 U.S.C. §

9712(b)(2)(A).

Sunnyside Coal Company was a signatory operator under the terms of the Coal Act.

On March 25, 1994, after ceasing coal mining operations at its Carbon County, Utah

facility, it filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy

Code.  Although Sunnyside continued to pay health benefits for its prepetition retirees as

required by § 9711(a), it sought bankruptcy court authority under 11 U.S.C. § 1114[3] to

terminate postpetition payments for any newly retired employees.  The bankruptcy court

denied the request, and Sunnyside, in 1995, terminated its individual employer plan,

stopped paying benefits to prepetition retirees, and converted its effort to reorganize into a

liquidation under Chapter 7.  Although Sunnyside settled with the Chapter 11 bankruptcy

---

[3]11 U.S.C. § 1114(a) provides:

> For purposes of this section, the term "retiree benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

trustee, paying its obligations to statutorily eligible retirees to the 1992 Plan, it refused to continue making payments once it converted to Chapter 7.

The 1992 Plan (Claimant) filed a proof of claim to recover continuing and future payments it made under the Coal Act to Sunnyside retirees, characterizing those payments as taxes owed by the estate and entitled to priority treatment under 11 U.S.C. § 503(b)(1)(B). The Trustee objected, and the bankruptcy court, believing *In re Reorganized CF&I Fabricators of Utah, Inc.,* 518 U.S. 213 (1996), trumped *Chateaugay*, allowed the Trustee's objection and held the claim is not an administrative expense of the Chapter 7 estate. The district court reversed, finding that nothing in *CF&I* affected "the continuing vitality of the analytical approach in *Chateaugay*." Applying that approach, the district court concluded the Claimant's premiums fit the functional analysis embraced by this court in determining whether a particular payment is a tax. These payments, the district court held, are statutory obligations under the Coal Act, unique to the particular circumstances Congress sought to address.

**II.**

In this appeal, the Trustee contends the premiums assessed by the 1992 Plan, "a private, privately financed multiemployer employee benefit plan," are not administrative expenses under § 503(b)(1)(B).[4] Although it asserts *Chateaugay* was wrongly decided

---

[4]Westmoreland Coal Company has weighed in here as amicus curiae. As a recipient of a similar ruling from the bankruptcy court, *In re Westmoreland Coal Co.*, 213 B.R. 1 (Bankr. D. Colo. 1997), it contends the more appropriate inquiry is whether

(continued...)

and distinguishable, we have long embraced the same functional analysis utilized by the Second Circuit to decide whether particular payments may be deemed taxes. *See United States v. Dumler (In re Cassidy)*, 983 F.2d 161, 163 (10th Cir. 1992). That approach begins with *New York v. Feiring,* 313 U.S. 283, 285 (1941), which held a tax priority, albeit under § 64 of the 1938 Bankruptcy Act, "extends to those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." Analyzing the contours of these involuntary burdens of governmental making rather than settling on the particular label for the exaction has remained the Court's focus in applying the *Feiring* definition. *See CF&I*, 116 S. Ct. at 2111*; National Cable Television Ass'n v. United States*, 415 U.S. 336, 340-41 (1974).

*Chateaugay* also sharpened its analysis by applying criteria summarized by the Ninth Circuit in *County Sanitation District No. 2 of Los Angeles County v. Lorber Indus. of Calif., Inc. (In re Lorber Indus. of Calif., Inc.)*, 675 F.2d 1062, 1066 (9th Cir. 1982). These four factors address whether the payments are:

> (a) An involuntary pecuniary burden, regardless of name, laid upon the individuals or property;
> (b) Imposed by, or under authority of the legislature;
> (c) For public purposes, including the purposes of defraying expenses
> of government or undertakings authorized by it;
> (d) Under the police or taxing power of the state.

---

[4](...continued)
the liability for Coal Act premiums constitutes a preconversion or postconversion claim. The UMWA has also filed an amicus brief.

Based on its exhaustive analysis of the statutory history, the Second Circuit summarily found each element present in these statutory payments:  "[i]t is uncontested [] Coal Act contributions are involuntary burdens assessed by Congress," satisfying the first two factors; "the Coal Act serves a public purpose;" and arguably represents "at least partially an exercise of the taxing power," evidenced by the Act's placement by Congress in Subtitle J of the Internal Revenue Code with enforcement powers granted to the Secretary of the Treasury in 26 U.S.C. § 9707.  53 F.3d at 498.  Following the Second Circuit's lead, the Fourth Circuit has also concluded Coal Act "obligations are 'involuntary pecuniary burdens imposed by Congress for the public purpose of restoring financial stability to coal miners' benefit plans.'"  *Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 793 (4th Cir. 1998) (quoting *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 718 (4th Cir. 1989)); *see also United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 583 (4th Cir. 1996) (no basis to distinguish use of the term "tax" in the Bankruptcy Code from use of the term in the tax exclusion provision of the Declaratory Judgment Act and the Anti-Injunction Act).

The Trustee's contrary argument here disconnects Coal Act premiums from their historical roots and statutory context, attempting to refashion them into collectively bargained payments made under contractual agreements between coal operators and the UMWA.  However, as the district court observed, "[w]hile the immediate beneficiaries are

the eligible retirees and their families, the evident objective of the Coal Act was the preservation of the nation's coal industry by promoting labor peace through the protection of health benefits for those employees of companies that discontinued operations." Congress thus created a statutory obligation to serve a unique purpose, not unlike, for example, the imposition of unemployment taxes on employers or the assessment of uninsured motor vehicle "taxes" on licensed drivers. *Williams v. Motley*, 925 F.2d 741, 743 (4th Cir. 1991). Here, the obligation to pay derives from the Coal Act, not, as the Trustee urges, from a contractual arrangement between the fund created and the operator. Its purpose is to support the government in its effort to maintain stability in the coal industry. While calling that purpose "public" is admittedly imprecise, it is neither misleading nor difficult in the context of the limited inquiry we perform.

This conclusion is consistent with *CF&I* in which the Supreme Court resolved a split in the Circuits over whether an ERISA 10% exaction on an accumulated funding deficiency was a "tax" subject to priority treatment under the Code or a penalty subordinated to the claims of all other general unsecured creditors. Finding no explicit reference to the treatment of this subject in the Bankruptcy Code, the Court employed the same functional analysis followed in *Chateaugay* and asked whether the particular exaction "is an enforced contribution to provide for the support of government." 518 U.S. at 222 (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)). To answer this question, given the absence of a definition of the term "tax" in the Bankruptcy Code, the

- 10 -

Court looked to ERISA's legislative history and statutory scheme and concluded the exaction was a penalty and not a "tax" simply because of the label it bore.  The Court reaffirmed "the continuing vitality of the cases in the *Feiring* line."  518 U.S. at 221.  Thus, *CF&I* is not inconsistent with *Chateaugay* nor does it require a different analysis here.[5]

The undeniably involuntary nature of these assessments as crafted by the Coal Act to directly remediate continuing crises in the nation's production of coal qualifies them as taxes.  We thus join the Second and Fourth Circuits and hold the premiums are taxes.

---

[5]The dissent argues the *Lorber* factor "for a public purpose" alters *CF&I*'s analysis which instead asked whether the exaction "supports the government."  518 U.S. at 222.  This difference has the potential of transforming every assessment into a "public purpose" tax, it asserts, relying on *In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 341 (6th Cir. 1993).  That case held workers compensation premiums are taxes in light of the state's mandatory collection system and the need to maintain the financial soundness of the workers compensation fund.  In so concluding, the Sixth Circuit stated, "Thus, looking at the public purpose of a payment due the Government may help determine whether the payment is akin to a tax, but this must not be the determinative criterion."  *Id.* at 342.  For this proposition, the Sixth Circuit relied upon *New Neighborhoods v. West Virginia Workers' Compensation Fund*, 886 F.2d 714 (4th Cir. 1989).  However, in *Adventure Resources,* the Fourth Circuit also relied on *New Neighborhoods* as the authority for concluding that Coal Act premiums are taxes "'for the public purpose of restoring financial stability to coal miners' benefit plans.'"  *Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 793 (4th Cir. 1998) (quoting *New Neighborhoods*, 886 F.2d at 718.  Further, *Williams v. Motley*, 925 F.2d 741, 744 (4th Cir. 1991), cited by the dissent, also relies on *New Neighborhoods* to conclude the "public purpose" of an uninsured motorist assessment is for the state to offset the costs it would ultimately bear if drivers did not obtain this insurance.  That *CF&I* did not use the precise language "for a public purpose" and instead stated "for a purpose of supporting the Government" is a semantical distinction without a difference.  Moreover, neither *CF&I* nor *Chateaugay* looked at this factor as determinative.

**III**.

This conclusion, however, does not end our inquiry. The question remains whether these taxes are "incurred by the estate" and entitled to administrative expense priority under 11 U.S.C. § 503(b). The district court held the premiums are a tax "incurred by the estate" because under § 9712(d)(1)(A) liability for premium payments made by the Claimant to Sunnyside's retired employees continues to accrue even though Sunnyside is no longer "in business." The Trustee contends, however, had the district court looked to bankruptcy law and not the Coal Act, it would have correctly concluded the Chapter 7 estate could not "incur" the expense following conversion. The Trustee contends the district court's holding "effectively burdens" the trustee's duties under 11 U.S.C. § 704 by making the performance of those duties a taxable event. The Claimant counters as long as the Chapter 7 estate has assets, taxes accrue each tax period, and the estate incurs liability for those payments until all of the assets have been liquidated and the estate closed. The district court agreed.[6]

Section 503(b)(1)(B) states:

> (b) After notice and a hearing, there shall be allowed administrative expenses ... including –

---

[6]Although the Claimant argued to the bankruptcy court the Chapter 7 estate must continue to pay benefits for as long as Sunnyside retirees receive benefits from the 1992 Plan, it altered that position before the district court. There, it contended some time after disposition of all of the estate's physical assets and before submission of the Trustee's final report, the tax liability would cease to accrue and the estate may be prepared for closing.

> (B) any tax –
>> (i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title ....

11 U.S.C. 503(b)(1)(B)(i). Only taxes "incurred by the estate" are administrative expenses entitled to first priority under § 507(a)(1). However, until the petition is filed, there can be no estate; hence "first priority for tax claims extends only to postpetition taxes." 4 *Collier on Bankruptcy*, ¶ 503.7[1], p. 503-49 (1998). Although the Bankruptcy Code does not define the term "incurred," the Circuits addressing the issue have uniformly held a tax is incurred when it accrues. *United States v. Redmond*, 36 B.R. 932, 934 (D. Kan. 1984); *see also Adventure Resources v. Holland*, 193 B.R. 787, 795 (S.D. W.Va. 1996); *In re Johnson*, 190 B.R. 724, 727 (D. Mass. 1995); *Midland Central Appraisal Dist. v. Midland Indus. Serv. Corp. (In re Midland Indus. Serv. Corp.)*, F.3d 164, 166-67 (5th Cir. 1994); *Seidle v. United States (In re Airlift Int'l, Inc.)*, 120 B.R. 597, 600 (S.D. Fla. 1990); *United Steelworkers of Am. v. Pension Benefit Guaranty Corp. (In re Wheeling-Pittsburgh Steel Corp.)*, 103 B.R. 672, 693 (W.D. Pa. 1989); *In re O.P.M. Leasing Services, Inc.*, 68 B.R. 979 (S.D.N.Y. 1987); 35 *In re Overly-Hautz Co.*, 57 B.R. 932, 937 (Bankr. S.D. Calif. 1986); *In re Scrap Disposal, Inc.*, 24 B.R. 178, 180 (Bankr. S.D. Calif. 1982). Thus, for the 1992 Plan's claims to be incurred by the estate, they had to accrue after Sunnyside filed its petition for relief.

The Trustee contends, however, any postpetition claim the Claimant may have must relate back to "a single, unitary, prepetition obligation" arising from collective bargaining

agreements between Sunnyside and the UMWA and the prepetition enactment of the Coal Act. Thus any claims for taxes incurred prepetition but arising after the petition is filed must be treated as if the claim arose before the filing of the petition under 11 U.S.C. § 502(i), it urges, and cites in support *Isaac v. Temex Energy, Inc. (In re Amarex)*, 853 F.2d 1526, 1530 (10th Cir. 1988) (inquiry must focus on what consideration supports the claim and whether it or any portion was prepetition). Moreover, even were the claims to accrue after the case was converted to Chapter 7, the Trustee argues Sunnyside was no longer in business capable of incurring obligations to its former employees.

Again, these arguments not only ignore the Coal Act but attempt to override its provisions with those of the Bankruptcy Code when, in fact, the two statutory schemes may be harmoniously construed. While the Trustee characterizes the conversion to Chapter 7 as a bright line after which no taxes can accrue against the estate, the Coal Act does not distinguish between a last signatory operator who remains in business and one who declares bankruptcy and "liquidates" the coal mining operation. In either case, Coal Act premiums accrue for each tax period.

Although the Coal Act qualified eligibility for coverage in § 9711(a) with the condition the operator remain "in business," it eliminated that qualification for 1992 Plan participants in § 9712(d)(1)(A). Under § 9712(c)(1), the 1992 Plan "shall provide" health care benefits coverage substantially similar to that offered by prior coal wage agreements to beneficiaries whose eligibility is "based upon age and service." 26 U.S.C.

- 14 -

§ 9712(b)(2)(A); and, "with respect to whom coverage is required to be provided under section 9711, but who does not receive such coverage from the applicable last signatory operator or any related person." 26 U.S.C. § 9712(b)(2)(B). Thus, the premiums accrue whether or not the coal company remains in the coal or any related business; and these obligations clearly accrue postpetition.

Indeed, the import of § 9712(b)(2)(A) is fortified by the Act's definition of business: "A person shall be considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7). Given the breadth of this definition, the Trustee cannot evade the reach of § 9712(b)(1)(A)&(B) by claiming the liquidating entity that was Sunnyside Coal is not "in business"; hence, the Chapter 7 estate cannot incur the premiums assessed. Being in the coal business is now irrelevant to the operation of the Coal Act. The Bankruptcy Code, which doesn't itself define what constitutes "in business," does not trump the clear intent of the Coal Act but simply effectuates treatment of any claims that may arise from its operation.

Precedent supports this reading. In *Lindsey Coal Min. Co. v. Chater*, 90 F.3d 688, 692 (3d Cir. 1996), the Third Circuit agreed the statutory definition of "in business" is broad and held the liquidating trust spawned by the winding up of Lindsey Coal Mining Company generated substantial income over the twenty-two year period it was "liquidating" its active coal mining operations. The court affirmed the trust was therefore

- 15 -

liable for Coal Act premiums due. ***Holland v. Double G Coal Co.*** also held 1988 last signatory operators are responsible for 1992 Plan premiums regardless of whether they remain in business. 898 F. Supp. 351 (S.D. W.Va. 1995). "[B]y not including the term 'remaining in business' in section 9712, Congress must have intended section 9712 of the Coal Act to apply to all 1988 last signatory operators, whether or not they remain in business." ***Id.*** at 354. In reaching this conclusion, the court reminded, "the principal problem with prior plans that the Coal Act was designed to remedy had been caused by coal operators ceasing business and 'dumping' those employees for whom they were obligated to provide benefits. The complete exemption from coverage of the Act of those companies who are no longer in business would resurrect to some degree the very problem the Act was designed to remedy." ***Id.*** Thus, ***Holland*** found while Congress exempted some employers no longer in business from the requirements of § 9706 and § 9711, § 9712(b)(1)(A)&(B) does not exempt them from obligations under the 1992 Plan. We, too, conclude under the Coal Act a former coal operator remains liable for 1992 Plan premiums even if it chooses to cease coal mining operations, undertake different business activities, or enter into liquidation. *See **In re Leckie Smokeless Coal***, 99 F.3d at 581 n.9.

We therefore hold Coal Act premiums are taxes incurred by the estate and entitled to administrative expense priority under § 503(b)(1)(B). These obligations will continue to accrue until the Trustee has liquidated all of Sunnyside's assets and submitted his final report. We therefore **AFFIRM** the district court judgment allowing priority status to the

1992 Plan's claim and **REMAND** the case for further proceedings generated by our

holding.

**No. 97-1276 -- In re Sunnyside Coal Co.**

BRORBY, Circuit Judge, dissenting.

Over five decades ago, the Supreme Court defined a "tax" for bankruptcy priority purposes to be a "pecuniary burden[] laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *United States v. Feiring*, 313 U.S. 283, 285 (1941) (construing earlier version of bankruptcy statute). Years later, in 1982, the Ninth Circuit created a four-factor analysis, initially proposed by one of its district courts, that was intended to flesh out the Supreme Court's definition. *County Sanitation District No. 2 of Los Angeles County v. Lorber Indus. of Calif., Inc. (In re Lorber Indus. of Calif., Inc.)*, 675 F.2d 1062, 1066 (9th Cir. 1982). I was a member of the only panel of this court, before this case, to employ the Ninth Circuit's four-factor analysis, *United States v. Dumler (In re Cassidy)*, 983 F.2d 161, 163-64 (10th Cir. 1992); however, the facts of this case put that analysis in a new light and demonstrate to me a serious flaw in its construction. Therefore, I must dissent from the application of that analysis in this case.

As the majority notes, applying the *Lorber* analysis, an obligation is a "tax" for bankruptcy priority purposes if it is:

(a)     An involuntary pecuniary burden, regardless of name, laid upon the individuals or property;
(b)     Imposed by, or under authority of the legislature;
(c)     For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;
(d)     Under the police or taxing power of the state.

*In re Lorber*, 675 F.2d at 1066.  The third prong of this analysis is too broad.

Specifically, the use of "for public purposes" renders it overly inclusive.

I agree with the Sixth Circuit that the emphasis on "public purpose" in the third prong of this analysis is misplaced and may cause great mischief.  *See Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.)*, 998 F.2d 338, 340-41 (6th Cir. 1993).  That circuit recognized the flaw in the "for public purposes" language and altered its analysis accordingly.  We should do the same.  If one defines a tax as a pecuniary burden laid upon individuals or property "for public purposes," any state-mandated obligation becomes a "tax."  For example, under this analysis, mandatory car insurance premiums would probably constitute a "tax."  *Cf. Williams v. Motley*, 925 F.2d 741 (4th Cir. 1991) (employing *In re Lorber* analysis to find state-imposed uninsured motorist fees are taxes for bankruptcy priority purposes).  "The threat of the *Lorber* reasoning, then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments....  This would turn on its head the

traditionally egalitarian manner in which the Bankruptcy Code has dealt with competing creditors ...." *Yoder*, 998 F.2d at 341.

The majority's analysis with respect to the issue in this case exemplifies one of the problems with the *Lorber* analysis: the third prong weeds nothing out.[1] In this case, the majority dispatches the third prong by quoting another circuit's conclusion that "the Coal Act serves a public purpose." Arguably, all acts of Congress serve a public purpose. To have any real discriminating effect, the requirement should be restricted to obligations that serve a purpose of supporting the government, as the *Feiring* case appears to require.

More recent Supreme Court decisions also appear to require a more narrow interpretation of "tax" in these circumstances. In 1996, the Supreme Court had occasion to revisit this issue in *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996). In that case, the court stated "a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the

---

[1] Our earlier decision in *Cassidy* also demonstrates the "for public purposes" language may not serve its purpose of effectively discriminating among taxes and non-taxes. In that case, the inquiry hinged on whether the third prong had been met. *Cassidy*, 983 F.2d at 163. Because the purpose of the statute in question was unclear, this court determined the third prong was inconclusive and had to turn to general bankruptcy policy to decide the case. *Id.* at 164-65.

Government." *Id.* at 224 (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906)). This strikes me as a more carefully tailored definition than "for a public purpose." The majority says the Supreme Court, in *CF&I*, "employed the same functional analysis found in *Chateaugay*." This is not totally accurate. In *CF&I*, the Court reaffirmed the vitality of the *Feiring* line of cases, but it did not employ, or even mention, the four-prong analysis that formed the basis of the *Chateaugay* decision. I believe this circuit should amend the third prong to conform more closely to the Supreme Court's definition of tax by shifting the focus from "for public purposes" to "for the purpose of supporting the Government."