In re LTV STEEL COMPANY,
INC., et al., Debtors.

No. 00–43866.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Aug. 28, 2003.

Marilyn L. Baker, Mooney, Green, Baker & Saindon, P.C., Washington, DC, Joyce Goldstein, Goldstein & O'Connor, A Legal Professional Association, Cleveland, OH, for UMWA Combined Fund.

Jeffrey B. Ellman, Jones Day, Columbus, OH, John Woodrum, Washington, DC, for LTV Steel Co., Inc.

Michael VanNiel, Baker & Hostettler, Cleveland, OH, for Administrative Claimants' Committee.

## MEMORANDUM OF OPINION

RUSS KENDIG, Bankruptcy Judge.

### Procedural History

This matter is before the court on the objection of LTV Steel Company, Inc., Debtor and Debtor–in–Possession (hereafter "Debtor"), to the nontrade administrative claim and related prepetition proofs of claim of United Mine Workers of America Combined Benefit Fund (hereafter "Combined Fund"). Combined Fund responded to Debtor's objection on June 6, 2003, and Debtor filed a reply on June 20, 2003.

A hearing on the matter was held on June 24, 2003. Jeffrey Ellman and John Woodrum appeared on behalf of Debtor, and Marilyn Baker appeared on behalf of Combined Fund. Also present at the hearing were Michael VanNiel on behalf of the Administrative Claimants' Committee and Joyce Goldstein on behalf of Combined Fund. Debtor, Combined Fund and the Administrative Claimants' Committee filed supplemental briefs on July 22, 2003.

### Jurisdiction

The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district on July 16, 1984. This is a core proceeding over which the court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O). The following constitute the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### Facts

#### I. Background

Through its corporate predecessors, Debtor was a signatory to a series of National Bituminous Coal Wage Agreements. Pursuant to the wage agreements, signatories were required to maintain an employee benefit plan during the term of the wage agreements providing health benefits to active employees and former employees who retired on or after January 1, 1975. If an employer ceased to be a signatory under the wage agreements, its obligation to provide retiree health care shifted to the United Mine Workers of America 1974 Benefit Plan (hereafter "1974 Benefit Plan"), which is a contractually created multi-employer retiree health plan funded by signatories to the wage agreements.

The Seventh Circuit Court of Appeals, in *In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir.1991), held that Debtor did not have a contractual or legal obligation to continue to provide benefits to its United Mine Workers of America (hereafter "UMWA") retirees after the expiration of the 1984 wage agreement because Debtor did not sign a successor wage agreement. *Id.* at 1208–09. Therefore, the trust established under the 1974 Benefit Plan covered Debtor's UMWA retirees.

In response to the impending financial doom of the UMWA multi-employer retir-

ee health care plans, the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. § 9701 *et seq.*, was enacted. The Coal Act imposed a statutory obligation on former signatories, like Debtor, to pay certain health and death benefit premiums for thousands of UMWA retirees. The Social Security Administration assigned Combined Fund beneficiaries to Debtor.[1] As a result of these assignments, pursuant to § 9704 of the Coal Act, Debtor, and its "related persons,"[2] have been responsible for the payment of premiums to Combined Fund for each plan year since Combined Fund's inception. Debtor and its related persons are liable for the premiums while they are "in business" as defined in § 9701(c)(7). The parties have stipulated that Debtor was in business until December 31, 2002. *See* Stip., p. 5–6.

Several courts have held that the premium obligations under the Coal Act are taxes for the purposes of bankruptcy. *See United Mine Workers of Am. 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.),* 146 F.3d 1273, 1278 (10th Cir.1998); *Adventure Resources, Inc. v. Holland,* 137 F.3d 786, 795 (4th Cir.1998); *United Mine Workers of Am. v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 583 (4th Cir.1996); *LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 498 (2d Cir.1995). Taxes are

entitled to administrative priority under 11 U.S.C. §§ 503(b)(1)(B) and 507.

On February 12, 2003, Judge Bodoh issued a Wind Down Order, which effectively created a new paradigm. Debtor remained in Chapter 11, but its demise and liquidation was formalized. The order granted superpriority status to certain creditors under 11 U.S.C. § 364(d) to allow for the liquidation of Debtor's assets, similar to the priority granted to Chapter 7 administrative expenses over Chapter 11 administrative expenses. This order allows Debtor to liquidate without officially converting the case to one under Chapter 7. It was generally agreed that this would be quicker and cheaper than Chapter 7, while a traditional Chapter 11 was pointless or even impossible at this point in time.

## II. Issues

The issues in this case were narrowed from those initially presented on brief. The parties entered into a stipulation of facts leaving only the following issues to be determined by the court.

1. *Is the benefit premium incurred annually or monthly under the Coal Act?*

If the premium was incurred annually on October 1, 2002 while Debtor was still

---

**1.** Beneficiaries were assigned to LTV Corporation, LTV Steel and Jones and Laughlin Steel Corporation, which collectively form LTV Steel (Debtor).

**2.** A "related person" to a signatory operator is defined as an entity that, as of July 20, 1992, was

(i) a member of the controlled group of corporations ... which includes such signatory operator;

(ii) a trade or business which is under common control ... with such signatory operator; or

(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries.

26 U.S.C. § 9701(c)(2) (West 2003). The parties have stipulated as to which of the debtors are considered "related persons" to LTV Corporation and LTV Steel. *See* Stipulation of Facts Regarding Non–Trade Administrative Claim and Related Prepetition Proofs of Claim of the United Mine Workers of America Combined Benefit Fund (hereafter "Stip."), p. 2–3 (D.I.5781).

in business, Debtor owes the premium payments for the months of January 2003 through September 2003. If it was incurred on a monthly basis, Debtor does not owe the premium payments for those months because the parties have stipulated that Debtor was no longer in business as of December 31, 2002.

2. *Is Combined Fund's post-wind down claim entitled to be paid on a superpriority status pursuant to the Wind Down Order?*

Assuming that Debtor incurred the premium on an annual basis and owes payments for January 2003 through September 2003, the court must determine whether the claim is entitled to superpriority status pursuant to the Wind Down Order.

3. *Is Combined Fund entitled to interest on its administrative expense claim?*

Combined Fund seeks interest on postpetition payments that have not been made. Combined Fund argues that the premium is a tax and postpetition taxes are entitled to be paid interest.

### Arguments Presented

On November 25, 2002, Combined Fund filed its proof of claim for prepetition debt incurred by Debtor.[3] On January 17, 2003, Combined Fund filed its nontrade administrative claims for amounts incurred postpetition. Debtor objected to both claims in an objection filed on May 15, 2003.

Debtor's objection to Combined Fund's Nontrade Administrative Claim rests on the determination that it was no longer "in business" pursuant to the terms of the Coal Act as of December 31, 2002.[4] Debtor argues that its obligation to pay any premiums terminated when it sold LTV Tubular on December 31, 2002 and its status changed to no longer being "in business." Debtor challenges its obligation to pay the premiums for the 2003 Plan Year[5] that came-due during the months from January 2003 through September 2003. Debtor argues that the premiums were incurred on a monthly, not annual, basis and its obligation to pay the monthly premiums terminated when it ceased to be "in business."

Combined Fund argues that the premiums are incurred on an annual basis. Combined Fund argues that Debtor incurred the entire 2003 Plan Year premium on October 1, 2002 and was permitted, pursuant to the statute, to pay the premium in twelve monthly installments. Combined Fund argues that because the entire 2002 Plan Year premium was incurred on October 1, 2002, when Debtor was still "in business," Debtor owes the payments for the months of January 2003 through September 2003 even though Debtor was no longer "in business" during those months.

Debtor asserts that if the court determines that Combined Fund is due the premium payments for the months of January 2003 through September 2003, Combined Fund's administrative claim for these amounts is not entitled to superpriority status pursuant to the Wind Down

---

**3.** Debtor's objection to this claim is no longer before the court. The parties have stipulated an intent to resolve this matter by agreement after recalculation of the amounts. *See* Stip., p. 8.

**4.** The parties initially disputed Debtor's "in business" status but have stipulated that as of December 31, 2002, with the sale of LTV Tubular, Debtor was no longer "in business" as defined by the Coal Act. *See* Stip., p. 5–6.

**5.** The 2003 Plan Year runs from October 1, 2002 through September 30, 2003.

Order. Combined Fund counters that the premium is a tax coming due during the Wind Down period and therefore is entitled to superpriority status. Combined Fund argues that Debtor is paying other taxes through the Wind Down Budget, and Combined Fund's claim is indistinguishable from those being paid.

Finally, Debtor challenges Combined Fund's demand for interest on all unpaid postpetition premiums. While Debtor recognizes a general rule that permits postpetition interest to accrue on taxes, it argues that this rule is not absolute and that the equities in this case should not allow for the payment of interest on Combined Fund's postpetition claim.

### Analysis

### I. The Premium Is Incurred Annually Pursuant to the Coal Act

 and Combined Fund made compelling arguments for mutually exclusive interpretations. The logic of these interpretations impels the conclusion that the court must simply read the statute as written. The statute says there is an annual premium.[6]

The Coal Act provides for the payment of an annual premium. Section 9704, "Liability of assigned operators," states in pertinent part:

(a) **Annual premiums.** Each assigned operator shall pay to the Combined Fund for each plan year beginning on or after February 1, 1993, *an annual premium* equal to the sum of the following three premiums—

(1) the health benefit premium determined under subsection (b) for such plan year, plus

(2) the death benefit premium determined under subsection (c) for such plan year, plus

(3) the unassigned beneficiaries premium determined under subsection (d) for such plan year.

Any related person with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator.

26 U.S.C. § 9704(a) (West 2003) (emphasis added). The specific language of the Coal Act states that the premium is incurred on an annual basis. Debtor argues that the premium is incurred on a monthly basis, but this misconstrues the language of the statute. The statute permits *monthly installment payments* of the *annual premium.* "The annual premium under subsection (a) for any plan year shall be payable in 12 equal monthly installments, due on the twenty-fifth day of each calendar month in the plan year." 26 U.S.C. § 9704(g) (West 2003). This is not dissimilar to many insurance policy premiums that are assessed on an annual basis but payable in installments by the policyholder.[7] It also makes the program adminis-

---

**6.** "In interpreting the [United States] Code, the Supreme Court directed that a court should first look to the plain meaning of the language, and if the intent of Congress is clear, the court must give effect to the unambiguous intent of Congress." *In re Vanguard Airlines, Inc.*, 295 B.R. 908, 915 (Bankr. W.D.Mo.2003) (*citing Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) ("Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its

enactments to carry 'their ordinary, contemporary, common meaning.' "); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (when the statute's language is plain the court's function is to enforce the statute according to its terms)).

**7.** Some policies contain an unearned premium provision providing a credit if a policyholder cancels the policy before its term expires, often effectively evening out the equation.

tratively manageable to perform many functions only once a year.

Debtor incurred the 2003 Plan Year premium on October 1, 2002. "The first plan year of the Combined Fund shall begin February 1, 1993, and end September 30, 1993. Each succeeding plan year shall begin on October 1 of each calendar year." 26 U.S.C. § 9702(c) (West 2003). As of October 1, 2002, Debtor was still in business pursuant to such definition in § 9701(c)(7). "[A] person shall be considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7) (West 2003). Debtor did not sell its Tubular division until December 31, 2002.

Debtor owes the premium for the 2003 Plan Year, which was incurred on October 1, 2002, because it was still in business at that time. This includes payments due for the months of January 1, 2003 through September 30, 2003. The fact that Debtor was no longer "in business" as of December 31, 2002 is of no consequence because the liability was fully incurred on October 1, 2002.

Debtor argues that the Commissioner fixes the annual premium on October 1, 2002, but the premium liability is incurred on a monthly basis. Equally compelling arguments can be made, but the statute says what it says: "annual." The total amount for the Plan Year is incurred on October 1st of each year, and the monthly payments are a function of that figure. The Coal Act labels the premium as "annual" but allows for monthly payments. The payment is the same every month. It is merely the yearly obligation divided by twelve. If, as Debtor argues, the premium was incurred monthly, it would follow that the premium should change in the circumstance where beneficiaries die. The number of beneficiaries would decrease, therefore, the premium should be reduced because there would be less people using the resources. This is not the case. The determination is made annually, fully incurred at that time but permitted to be paid on a monthly basis. This can be analogized with many types of large obligations that allow for monthly payments as a function of necessity.

## II. Combined Fund's Administrative Claim Is Not Entitled to Superpriority Status Pursuant to the Wind Down Order

■ On February 11, 2003, the court issued a Wind Down Order, which stated that "all parties extending credit to Debtor during the Wind Down process, on other than C.O.D. or cash-advance bases, are hereby granted a super-priority status and shall be treated equally by Debtor." Wind Down Order, p. 4 (D.I.5286). The Wind Down Order bifurcated the administrative claims into two categories: pre-Wind Down administrative claims to be paid on a pro rata basis and post-Wind Down administrative claims to be paid on a superpriority basis. Combined Fund argues that the premiums for January 2003 through September 2003 are entitled to the superpriority status granted under the Wind Down Order pursuant to 11 U.S.C. § 364(d). This argument fails on several grounds.

### A. The Debt Was Incurred Prior to the Issuance of the Wind Down Order

As discussed above, the annual premium was incurred on October 1, 2002, four months prior to the issuance of the Wind Down Order. Therefore, Combined Fund's claim arose prior to the Wind Down period and does not fall within the parameters of the Wind Down Order. While the payments are due during the Wind Down period, the payments repre-

sent an antecedent debt incurred on October 1, 2002.

## B. Combined Fund Did Not Extend Credit During the Wind Down Process

Combined Fund's post-wind down administrative expense claim is not entitled to superpriority status merely because the payments came due during the Wind Down period. Pursuant to the Wind Down Order, a creditor entitled to superpriority status pursuant to 11 U.S.C. § 364(d) must extend credit to the Debtor for goods or services. *See* Wind Down Order, p. 4 ("Taking Debtor's motion as a motion under § 364(d), all parties extending credit to Debtor during the Wind Down process, on other than C.O.D. or cash-in-advance bases, are hereby granted a super-priority status and shall be treated equally by Debtor.") Section 364(d) provides:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (West 2003). The Wind Down Order also required Debtor to file "a proposed Wind Down budget, to be supplemented monthly, or periodically as the budget may change, or as ordered by the Court. The Wind Down budget shall include all anticipated Wind Down expenses." Wind Down Order, p. 4. Only the expenses paid pursuant to the Wind Down Budget are entitled to superpriority status pursuant to the Wind Down Order.

Debtor submitted its first proposed Wind Down Budget on March 3, 2003 (D.I. 5390), which covered the period of March 1, 2003 through June 13, 2003. The budget did not include payments to Combined Fund for the premiums. Combined Fund filed what it characterizes as a "protective" objection on March 27, 2003 (D.I.5486), whereby it asserted its objection to its lack of inclusion in the Wind Down Budget.[8] The Wind Down Budget included very few items and encompassed one page. It consisted of five main categories of liability: payroll, healthcare, environmental, general and administrative, and professional fees. Taxes were a subheading under general and administrative fees. Combined Fund argues it should be paid along with these particular tax creditors. Debtor argues that the taxes being paid pursuant to the Wind Down Budget are only those required to perform the essential functions to wind down the estate.

Combined Fund did not extend credit to Debtor for any type of goods or services. The premium is a tax, which is incurred involuntarily as a matter of statutory law and does not provide anything needed to conduct the wind down process. There is no voluntariness on the part of Combined Fund or Debtor. There is no extension of credit. Debtor is not receiving anything necessary to wind down its affairs by paying the premiums. Section 364(d)(1)(A) states that superpriority status will be given only to those resources that the Trustee would not be able to obtain without this special priority. This is clearly intended to be a tool to ensure that Debtor be able to go into the marketplace and obtain re-

---

8. The foundation of that objection is currently before this court via Debtor's objection to Combined Fund's administrative claim.

sources necessary, in this case, for the wind down of its affairs. If Debtor did not have this tool, it would be unable to convince suppliers to provide goods or services due to the uncertainty of payment. This special priority is granted under limited circumstances and does not cover all claims. Combined Fund's claim is entitled to administrative priority, but it is not entitled to superpriority status. Combined Fund's claim does not fit within the purpose and intent of the Wind Down Order.

## C. Payment of Combined Fund Premiums Is Not Necessary for the Wind Down Process

Combined Fund argues that Debtor is paying other taxes coming due during the Wind Down period that cannot be distinguished from the taxes owed Combined Fund. Debtor has illustrated that the taxes being paid under the Wind Down Budget are necessary for the administration of the Wind Down. Debtor is paying taxes that are required for the transfer of property and for the payroll of its remaining employees. Debtor would not be able to obtain the quid pro quo from the specific taxes being paid in order to complete the wind down of its affairs. For example, filing fees must be paid in order for a deed to be accepted. Payroll taxes must be paid in order for employees to continue working.

## III. Combined Fund Is Entitled to Interest on the Unpaid Portion of its Administrative Claim

 "The general rule of actions in bankruptcy is that unsecured creditors are not entitled to postpetition interest upon their allowable claims." *In re Kentucky Lumber Co.,* 860 F.2d 674, 676 (6th Cir. 1988) (*citing* 11 U.S.C. § 502(b)(2) (1982 & Supp. IV 1986)). There are exceptions to this general rule. Combined Fund argues

that it is entitled to postpetition interest on its administrative tax claim pursuant to 11 U.S.C. § 503(b). Section 503(b) provides in pertinent part:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> . . .
>
> (1)(B) any tax—
>
> (i) incurred by the estate, except a tax of a kind specified in section 507(a)(8) of this title.

11 U.S.C. § 503 (West 2003). While no specific language in the text of § 503(b) grants interest on an administrative tax claim, Combined Fund relies on the Sixth Circuit Court of Appeals' decision in *In re Flo–Lizer,* 916 F.2d 363 (6th Cir.1990) to support its argument.

Debtor makes two arguments opposing Combined Fund's interest claim. First, Debtor argues that Combined Fund is not entitled to interest on its administrative claim pursuant to *In re Express One Int'l,* 217 B.R. 207 (Bankr.E.D.Tex.1998) and *In re Brooks & Woodington, Inc.,* 505 F.2d 794 (7th Cir.1974). Second, Debtor argues that *Nicholas v. United States,* 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966) requires that accumulation of interest be suspended when the case is converted to a liquidating proceeding.

## A. Sixth Circuit Case Law Grants Interest on Administrative Tax Claims Pursuant to 11 U.S.C. § 503(b)

Debtor makes compelling arguments that interest should not accrue, but these arguments are inescapably at odds with the controlling precedent.

Debtor's reliance on *Express One Int'l* and *Brooks & Woodington* to support its argument that Combined Fund is not enti-

tled to interest is misplaced. *Brooks & Woodington* denies interest on postpetition professional fees while Combined Fund's claim is for taxes which are given special treatment. Additionally, *Express One Int'l* is in direct contradiction with the Sixth Circuit's decision in *United States v. Flo–Lizer, Inc.*, 916 F.2d 363 (6th Cir. 1990), which states that administrative tax claims are entitled to interest under § 503(b).

Section 503(b) sets forth a non–exhaustive list of claims that are entitled to administrative expense priority. *In re Mary James, Inc.*, 211 B.R. 227, 228 (Bankr. E.D.Mich.1997). Section 503(b)(1)(B) includes taxes among those expenses entitled to administrative priority but does not expressly state whether interest on taxes is given such status. In *Flo–Lizer*, the Sixth Circuit held that interest on tax debts was entitled to administrative expense priority under § 503(b). Because § 503(b) is silent on the issue of interest, the *Flo–Lizer* court looked to the former Bankruptcy Act, case law and congressional intent. The court relied on *Nicholas*, which established a right to administrative priority on administrative tax claims. *Flo–Lizer* also relied on the policy that:

> The IRS is given preferred treatment under the Bankruptcy Code because it cannot choose its debtors or take advance security on tax debts. *See* 1978 U.S.Code Cong. & Admin. News at 6150–52. "While the bankruptcy laws can delay payment of taxes rightly owed, the operation of those laws should not work to force a taxing authority to make an interest-free loan to a party temporarily excused from paying taxes."

*Flo–Lizer*, 916 F.2d at 366 (*citing In re Mark Anthony*, 886 F.2d at 1108 n. 10 (*citing In re Boston and Maine Corp.*, 719 F.2d 493, 503–04 (1st Cir.1983))). While this is the general rule, it is not absolute.

There are numerous cases addressing this issue. "There is a split of authority on the propriety of allowing interest on a tax allowed as an administrative priority, with the majority holding that interest on taxes allowed as an administrative expense is also an administrative expense." Collier on Bankruptcy, TX 4.03 n. 21 (15th Ed.) ("*Compare In re Weinstein*, 272 F.3d 39, 47 (1st Cir.2001); *In re Colortex Indus., Inc.*, 19 F.3d 1371 (11th Cir.1994); *In re Del Mission Ltd.*, 998 F.2d 756 (9th Cir. 1993); *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir.1993); *In re Flo–Lizer, Inc.*, 916 F.2d 363 (6th Cir.1990); *United States v. Friendship College, Inc.*, 737 F.2d 430 (4th Cir.1984). *Contra In re Luker*, 148 B.R. 946 (Bankr.N.D.Okla.1992), *aff'd*, 1993 WL 740989 (N.D.Ok.1993); *In re Mansfield Tire & Rubber Co.*, 85 B.R. 437 (Bankr.N.D.Ohio 1987); *In re American Int'l Airways*, 77 B.R. 490 (Bankr.E.D.Pa. 1987).". The Sixth Circuit is among the majority.

*Flo–Lizer* relied heavily on the Supreme Court's pre-Code decision in *Nicholas*, but *Nicholas* itself provides illustrations where interest should not be paid. Debtor argues that the inequities that would be created by paying interest on Combined Fund's claim should outweigh contradicting case law. Debtor relies on the following language in *Nicholas* to support this argument.

> In the context of interest-bearing debts, the equitable principle enunciated in *Sexton [v. Dreyfus*, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911)] and [*City of New York v.] Saper[*, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949)] rests at bottom on an awareness of the inequity that would result if, through the continuing accumulation of interest in the course of subsequent bankruptcy proceedings, obligations bearing relatively high rates of interest were permitted to

absorb the assets of a bankrupt estate whose funds were already inadequate to pay the principal of the debts owed by the estate. n12

> n12 See *American Iron & Steel Manufacturing Co. v. Seaboard Air Line Railway*, 233 U.S. 261, [34 S.Ct. 502, 58 L.Ed. 949 (1914)], a case of equity receivership, where the Court stated that the general rule barring *post-petition interest on pre-petition claims* is not based on the fact that the claims "had lost their interest-bearing quality during that period, but is a necessary and enforced rule of distribution, due to the fact that in case of receiverships the assets are generally insufficient to pay debts in full. If all claims were of equal dignity and all bore the same rate of interest, from the date of the receivership to the date of final distribution, it would be immaterial whether the dividend was calculated on the basis of the principal alone or of principal and interest combined. . . . [I]n case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of the debt." 233 U.S. at 266[, 34 S.Ct. 502].

*Nicholas*, 384 U.S. at 683–84 n. 12, 86 S.Ct. 1674 (emphasis added). Unfortunately for Debtor, the above appears to only refer to prepetition claims. Nonetheless, the policy underlying the argument is compelling, especially when looked at in light of the facts of this case.

Debtor is administratively insolvent and could not confirm a plan of reorganization. Debtor, while still officially in a Chapter 11 case, is no longer reorganizing. Debtor is currently winding down its affairs pursuant to the court's Wind Down Order. Administrative claimants will only receive a pro rata distribution on their claims. This process of liquidating through a Chapter 11 case rather than a conversion and liquidation under Chapter 7 was advantageous to creditors. *See* Wind Down Order, p. 2 ("All parties acknowledge that a Chapter 7 conversion is unwise."). Debtor officially began its liquidation, and thereby terminated its reorganization pursuant to Chapter 11, on February 12, 2003 when the court issued the Wind Down Order.

Several competing policies are present. Debtor argues that § 503(b) should be interpreted narrowly to allow for equal distribution among creditors of Debtor's limited resources. *See, e.g., Devan v. Simon DeBartolo Group, L.P. (In re Merry–Go-Round Enters., Inc.)*, 180 F.3d 149, 157 (4th Cir.1999); *Pension Benefit Guar. Corp. v. Skeen (In re Bayly Corp.)*, 163 F.3d 1205, 1208 (10th Cir.1998). Nonetheless, several circuit courts, including the Sixth Circuit, have concluded that administrative tax claims are entitled to priority under §§ 503(b) and 507. While it appears inequitable to the court that Combined Fund receive interest on its pro rata share of its administrative claim, the Sixth Circuit's opinion in *Flo–Lizer* is both specific and binding. The premiums owed to Combined Fund are taxes which are entitled to be paid interest. While this outcome does not mesh with the policy that all creditors of similar priority be treated similarly, the court is bound by the Sixth Circuit's decision in *Flo–Lizer.*

**B. Interest Does Not Stop Accruing on the Administrative Tax Claim Because Debtor Never Converted to a Chapter 7 Liquidation Proceeding**

Finally, Debtor argues that the interest on the claim was suspended when Debtor ceased reorganization and began the liquidation process. Debtor officially entered a period of liquidation on Febru-

ary 12, 2003, the date of the Wind Down Order, which authorized Debtor to implement the wind down of its affairs. Debtor cites several cases for the proposition that interest ceases to accrue once a debtor enters into the liquidation process. The *Nicholas* court stated that:

> A tax incurred within any one of these three periods [the prepetition, the reorganization and the liquidation period] would, we think, be entitled to bear interest against the bankrupt estate until, but not beyond, the close of the period in which it was incurred. Thus, in a case concerning taxes incurred during the first period—that is, before the filing of a petition for a Chapter XI arrangement—the Court has summarily affirmed a judgment holding that the accumulation of interest must be suspended as of the date the Chapter XI petition was filed.

*Nicholas*, 384 U.S. at 686, 86 S.Ct. 1674. Under this analysis, courts have held that administrative claims incurred during the reorganization period cease to accrue interest as of the date of conversion to liquidation. The court in *In re Hospitality Assocs. of Laurel*, 212 B.R. 188 (Bankr. D.N.H.1997) stated:

> It should also be noted that none of the Court of Appeals decisions [allowing interest on postpetition taxes] involve an explicit holding that post-petition interest on administrative tax claims, even if allowable by the statute, would extend beyond the date of *conversion to chapter 7*. This is not surprising since the original pre-Code decision in the Supreme Court in *Nicholas v. United States* ... reached a determination under the then-existing bankruptcy statute that interest on an administrative tax claim should be paid—but only as accrued during the reorganization stage of the case.

*Laurel*, 212 B.R. at 195 (footnote omitted) (emphasis added) (*citing Nicholas*, 384 U.S. at 686, 86 S.Ct. 1674). The Sixth Circuit has not issued a decision contrary to this analysis.

Collier also supports this analysis.

> Interest that would be allowable on administrative expenses incurred before conversion is allowable as part of the administrative expense given priority under section 348(d). However, the accrual of such interest against the estate stops on the date of conversion as it would with any prepetition unsecured claim under section 502(b)(2).

3 Collier on Bankruptcy—15th Edition Revised P 348.05 (*citing In re Sun Cliffe, Inc.*, 143 B.R. 789 (Bankr.D.Colo.1992); *In re Peter DelGrande Corp.*, 138 B.R. 458 (Bankr.D.N.J.1992)). Section 348(d) provides:

> A claim against the estate or the debtor that arises after the order for relief but before conversion in a case *that is converted under section 1112* ... of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348 (West 2003) (emphasis added). Section 502(b)(2) provides in pertinent part:

> Except as otherwise provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> ...

(2) such claim is for unmatured interest. 11 U.S.C. § 502 (West 2003).

The issue then becomes whether the above law applies to Debtor's liquidation. Debtor did not convert under § 1112; it is liquidating through Chapter 11. The Code and the case law state that interest stops accruing upon a conversion to Chapter 7. Because Debtor did not convert to a Chapter 7 liquidation pursuant to § 1112, § 348(d) and § 502(b)(2) are inapplicable. Therefore, Debtor's argument that interest stopped accruing when the case converted to a liquidation proceeding must fail. Debtor never offered a proposed date that such "conversion" occurred.

The Wind Down Order granted superpriority status and created a liquidation without officially converting the case to Chapter 7. In essence, it created a chimeric status, containing organic features of both liquidation and reorganization. The creativity, flexibility and efficiency of the concept behind the Wind Down Order is commendable. Nothing in the Code or Rules prevents this. This allows the case to be treated like a liquidation case to the extent that the Code allows. The court and the parties can operate under this paradigm within the boundaries of the Code, but the paradigm cannot be extended beyond the literal language of the Code. The Code is specific that interest stops accruing only after a conversion under § 1112. The Code prevents the court from treating this case as a liquidation case on this issue because its language is specific. The cost of creating chimeric paradigms is being mired with the inconsistencies where the Code prevents the paradigm from being extended to its logical conclusion. This is not to be lamented at length, however, or our ability to create would become boundless. The rule of law requires that creativity, however well-intentioned, is restrained by the language of the statute. Otherwise, we are subject to the frustrations of an Alice in Wonderland character, as we learn that a word means exactly what someone else chooses it to mean, neither more nor less. Without such boundaries, the rule of law becomes as mad as a hatter.

## IV. Debtor Must Receive Credit for the Prepetition Premiums Paid on a Postpetition Basis

Debtor filed this case on December 29, 2000. The 2001 Plan Year premium was incurred on October 1, 2000. Debtor made all of its 2001 Plan Year premium payments. The 2001 Plan Premium is a prepetition debt. Several of the monthly payments were made on a postpetition basis. Debtor is entitled to the return or a credit of these funds to then be re-issued on a pro rata basis to all administrative claimants.

## Conclusion

Based on the foregoing, Debtor's objection is sustained in part and overruled in part. An appropriate order shall enter forthwith.

## ORDER

This matter is before the court on the objection of LTV Steel Company, Inc., Debtor and Debtor–in–Possession (hereafter "Debtor"), to the Nontrade Administrative Claim of United Mine Workers of America Combined Benefit Fund (hereafter "Combined Fund").

In accordance with the court's memorandum of opinion, Debtor's objection is **SUSTAINED** in part and **OVERRULED** in part. The parties shall have **30 days** from the entry of this order to agree upon the net amount owed after crediting the 2003 Plan Year liability with postpetition monthly installment payments on the pre-

petition plan year liability or to request a hearing to determine the same.

It is so ordered.